INMAN, Judge.
 

 *261
 
 A criminal defendant whose trial is delayed because of a backlog of forensic laboratory testing and who does not properly assert his speedy trial right until a trial has been scheduled has not been deprived of his constitutional right to a speedy trial.
 

 Juston Paul Johnson ("Defendant") appeals from a judgment finding him guilty of assault with a deadly weapon inflicting serious injury with an enhancement that at the time of the commission of the felony, Defendant was in possession or wore a bulletproof vest. Defendant argues he was denied a fair and speedy trial, and that the trial court erred in failing to dismiss the assault with a deadly weapon inflicting
 
 *262
 
 serious injury charge and the enhancement for the bulletproof vest for insufficient evidence. After careful review, we conclude that Defendant received a trial free of constitutional or other error.
 

 Factual & Procedural Background
 

 Evidence presented at trial tended to show the following:
 

 Shortly after 9:15 pm on Friday, 23 August 2013, Anthony Sutton ("Mr. Sutton") had just parked his vehicle and was walking in the parking lot outside his apartment at 400 Hammock Lane in Jacksonville when a man wearing a bulletproof vest and gloves drew a gun and pointed it at his face. Mr. Sutton struck the man in the face and ran into the backyard of his apartment building. Mr. Sutton then heard a pop and felt a stinging sensation in the back of his left leg. He continued running until he lost feeling in his left leg and fell to the ground. The man with the gun jumped on Mr. Sutton, asked him if he wanted to die, and fired another shot. Mr. Sutton felt a burning sensation in his head like the feeling in his leg and believed he had been shot in the head.
 

 Mr. Sutton grabbed the gun and fought with his assailant for it. Mr. Sutton then noticed another person in the yard, whom he at first thought was a neighbor coming to help him. But the other person joined in the fight, grabbed Mr. Sutton's hand that was on the gun, and placed a handcuff on Mr. Sutton's wrist. The person tried to handcuff both
 
 *129
 
 of Mr. Sutton's wrists, but Mr. Sutton punched him in the chest. The person with the handcuffs then put his hand inside Mr. Sutton's shorts and reached for his keys, then fell or moved to the ground, and then ran away. Mr. Sutton and the man with the gun continued to struggle, and Mr. Sutton heard his children screaming. At that point, Mr. Sutton released his grasp on the gun and tried to run toward the building. He then heard a third shot, his right leg went numb, and he fell again. After a few seconds, Mr. Sutton got up and ran to the front of the building. He reached the front of the adjacent apartment building, 600 Hammock Lane, when other people tackled him, told him to sit down, and began giving him first aid.
 

 Mr. Sutton did not recognize either of his assailants. Although he saw that the man with the gun was wearing a bulletproof vest, he did not notice whether the second man was wearing a vest. When he hit the second man in the chest, "it didn't feel like flesh. It felt like it was padded. But [he didn't] really know what [the man] on."
 

 Jacksonville police officers responded to a 911 call reporting shots fired outside of Mr. Sutton's apartment building and stopped a vehicle they
 
 *263
 
 encountered driving away from the call location. Inside the vehicle they found Latasha Sutton ("Ms. Sutton"), Mr. Sutton's estranged wife, in the driver's seat; Defendant in the front passenger seat; and Dwayne Robinson ("Mr. Robinson") in a rear passenger seat. A child was sitting in Ms. Sutton's lap and another child was sitting in the backseat near Mr. Robinson. Officers found a handgun belonging to Defendant in the center console. Officers found another handgun, which had recently been fired, under the floorboard of the backseat where Mr. Robinson was sitting. Officers also found a set of walkie talkies turned on and set to the same channel, a map, handcuffs, rope, and three or four bulletproof vests in the vehicle. One bulletproof vest was on the front floorboard on the right passenger side where Defendant was sitting at the time police stopped the vehicle.
 

 Defendant was ordered to exit the vehicle and was arrested and searched at the scene. Police found in his possession a pair of handcuffs and ten handcuff keys on a key chain. Police ultimately confiscated Defendant's pants. Forensic testing later determined that the pants were stained with Mr. Sutton's blood.
 

 Police removed Ms. Sutton, Mr. Robinson, and the children from the vehicle. Ms. Sutton told one of the officers, "[n]one of this would have happened if you would have done your job yesterday." The officer recognized Ms. Sutton and Defendant from his response to a domestic disturbance call at the same location a day earlier, on 22 August 2013. Ms. Sutton told police on that date that she was entitled to take custody of her children, who were in Mr. Sutton's apartment. Police officers were unable to assist Ms. Sutton and instructed her and Defendant to leave.
 

 Lawrence Herndon ("Mr. Herndon"), Mr. Sutton's next-door neighbor, was in his apartment on the evening of 23 August 2013 when he heard a loud popping noise. When he heard another pop, Mr. Herndon went to the back window of his apartment and saw three people struggling outside about 20 feet away. He saw one of the three people standing up above another person on the ground, pointing the gun down at the person's neck. He saw the third person going through the pockets of the person who was on the ground. Mr. Herndon told his wife to call 911 and heard another gunshot and saw someone, whom he later identified as Defendant, running toward the front of the area between his building and an adjacent apartment building. Mr. Herndon then heard a woman and children screaming, and when he opened his front door, he heard someone say "they took the kids." Mr. Herndon walked outside his front door and found Mr. Sutton lying on the sidewalk. Mr. Herndon then
 
 *264
 
 realized that Mr. Sutton was one of the three people who had been struggling in the back of the building. Mr. Herndon noticed that Mr. Sutton was handcuffed and bleeding.
 

 Jacksonville police officers arrived within a few minutes of the 911 call. Officers asked Mr. Herndon if he could identify one or more of three people standing in front of a patrol car. Mr. Herndon identified Mr. Robinson as the person who had been holding the gun to
 
 *130
 
 Mr. Sutton's neck and he identified Defendant as the person who was reaching into Mr. Sutton's pockets when Mr. Robinson was holding the gun on Mr. Sutton's neck. Mr. Herndon noticed that the man with the gun was wearing a bulletproof vest. He did not recall seeing Defendant wearing a bulletproof vest.
 

 After being advised of his
 
 Miranda
 
 rights, Defendant provided a written statement to police providing the following information: Defendant had come with Ms. Sutton to Mr. Sutton's apartment complex in Jacksonville on 22 August 2013 to pick up Ms. Sutton's children. Mr. Sutton refused to let Ms. Sutton take the children. The next day, 23 August 2013, Ms. Sutton told Defendant that Mr. Sutton had violated a restraining order and that he was on probation. Defendant returned to Mr. Sutton's apartment complex that evening with the understanding that Ms. Sutton had legal authority to take custody of the children because Mr. Sutton had violated his probation. Defendant's friend, Mr. Robinson, also rode with them, and they agreed that Ms. Sutton would drive the vehicle back to Fayetteville after picking up the children. After the vehicle was parked at the apartments, Mr. Robinson stepped out. Defendant was sitting in the vehicle with Ms. Sutton when he heard gunshots. Defendant saw Ms. Sutton's children outside the apartment building. He put the children in the vehicle and waited with Ms. Sutton for Mr. Robinson. Mr. Robinson then returned to the vehicle and they were in the process of leaving when they were stopped by police.
 

 Defendant was arrested on the night of the shooting and on the following day he was served with a warrant charging him with attempted first degree murder. Defendant initially waived his right to court-appointed counsel, but eventually counsel was appointed to represent him. On 13 October 2015, Defendant was charged in a superseding indictment with attempted first degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, and wearing or having in his immediate possession a bulletproof vest during the commission of the other charged felonies. On 24 October 2013, DNA evidence was collected from Defendant. From the time of his arrest until the jury
 
 *265
 
 returned verdicts of guilty on 10 December 2015, Defendant was held in custody under a bond set at more than $500,000.
 
 [1]
 

 On 14 November 2013, evidence including the pants Defendant wore on the night of the shooting and the DNA sample collected from Defendant was submitted to the State Bureau of Investigation Crime Lab for analysis. Having received no results after more than a year, the State submitted a "rush request" with the Crime Lab in January 2015. The Crime Lab released test results in May 2015 - more than 18 months after Defendant's arrest. After the test results were released, the case was set for trial, but the initial trial date of 5 October 2015 was continued at the request of Defendant's counsel to 9 November 2015.
 

 On 23 September 2015, Defendant's counsel filed a motion to withdraw from the representation on the basis that he had been discharged by Defendant. On 2 October 2015, the same counsel filed a motion to dismiss the charges based on the alleged violation of Defendant's right to a speedy trial.
 

 On 28 October 2015, again at the request of Defendant's counsel, the trial court postponed the trial from 9 November 2015 to 7 December 2015.
 

 On 7 December 2015, Defendant informed the trial court that he wanted his counsel to continue representing him. The trial court then conducted a hearing on Defendant's speedy trial motion, orally denied the motion, and proceeded to impanel a jury for trial. Defendant gave notice of appeal in open court.
 

 Analysis
 

 I.
 
 Speedy Trial Motion
 

 Defendant contends the trial court erred in denying his motion to dismiss the charges against him based on the State's violation of his constitutional right to a speedy trial. We affirm the trial court's ruling.
 

 *131
 
 The denial of a motion to dismiss on speedy trial grounds presents a question of constitutional law subject to
 
 de novo
 
 review.
 
 State v. Graham
 
 ,
 
 200 N.C.App. 204
 
 , 214,
 
 683 S.E.2d 437
 
 , 444 (2009). We therefore consider the matter anew and substitute our judgment for that of the trial court.
 
 State v. Williams
 
 ,
 
 362 N.C. 628
 
 , 632-33,
 
 669 S.E.2d 290
 
 , 294 (2008).
 

 *266
 
 The United States Supreme Court in
 
 Barker v. Wingo
 
 ,
 
 407 U.S. 514
 
 ,
 
 92 S.Ct. 2182
 
 ,
 
 33 L.Ed.2d 101
 
 (1972), established a four-part test to determine if a defendant had been denied his constitutional right to a speedy trial.
 

 Id.
 

 at 530
 
 ,
 
 92 S.Ct. at 2192
 
 ,
 
 33 L.Ed.2d at 116-17
 
 . The four factors are (1) the length of delay between accusation (by indictment or arrest) and trial; (2) the reason(s) for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant resulting from the delay.
 

 Id.
 

 No single factor is dispositive; "[r]ather, they are related factors and must be considered together with such other circumstances as may be relevant."
 

 Id.
 

 at 533
 
 ,
 
 92 S.Ct. at 2193
 
 ,
 
 33 L.Ed.2d at 118
 
 . The North Carolina Supreme Court expressly adopted the
 
 Barker
 
 factors in
 
 State v. Grooms
 
 ,
 
 353 N.C. 50
 
 , 62,
 
 540 S.E.2d 713
 
 , 721 (2000), and noted that the same analysis applies to speedy trial claims asserted under Article I, Section 18 of the North Carolina Constitution.
 

 Defendant notes that the trial court failed to articulate any findings of fact or conclusions of law. But the absence of findings and conclusions does not preclude review by this Court because none of the evidence relevant to Defendant's speedy trial motion was disputed.
 
 See
 

 State v. Chaplin
 
 ,
 
 122 N.C.App. 659
 
 , 663-64,
 
 471 S.E.2d 653
 
 , 656 (1996) ("The information before the trial court is not in dispute and thus the failure of the trial court to make findings of fact does not prevent review by this Court."). Reviewing the undisputed evidence of record we proceed to apply the
 
 Barker
 
 analysis.
 

 A.
 
 Length of Delay
 

 The length of delay between accusation and trial does not
 
 per se
 
 determine whether a defendant has been denied his speedy trial rights.
 
 Grooms
 
 ,
 
 353 N.C. at 62
 
 ,
 
 540 S.E.2d at 721
 
 . The United States Supreme Court has noted that a delay approaching one year "marks the point at which courts deem the delay unreasonable enough to trigger the
 
 Barker
 
 enquiry."
 
 Doggett v. United States
 
 ,
 
 505 U.S. 647
 
 , 652 n. 1,
 
 112 S.Ct. 2686
 
 , 2691 n. 1,
 
 120 L.Ed.2d 520
 
 , 528 n. 1 (1992). In this case, Defendant was arrested and remained incarcerated for nearly 28 months before he was tried. This delay raises the question of reasonableness and requires us to consider the additional factors.
 

 B.
 
 Reason for the Delay
 

 "[D]efendant has the burden of showing that the delay [of his trial] was caused by the neglect or willfulness of the prosecution."
 
 Grooms
 
 ,
 
 353 N.C. at 62
 
 ,
 
 540 S.E.2d at 721
 
 . If Defendant makes a
 
 prima facie
 
 showing that the delay resulted from neglect or willfulness by the State,
 
 *267
 
 the burden shifts to the State to provide a neutral explanation for the delay.
 
 State v. Spivey
 
 ,
 
 357 N.C. 114
 
 , 119,
 
 579 S.E.2d 251
 
 , 255 (2003).
 

 It is undisputed that the last four months of the delay of Defendant's trial resulted from his trial counsel's scheduling conflicts. It also appears that Defendant initially waived his right to appointed counsel but failed to retain counsel, so that counsel was appointed and first appeared for Defendant more than a month after his arrest. Seven months after his arrest, Defendant complained that his counsel had not spoken with him in two months. Ultimately, Defendant filed a
 
 pro se
 
 motion for appointment of new counsel, and Defendant's counsel filed a motion to withdraw from the representation. Delay caused by Defendant's indecision about counsel, counsel's lapse in communicating with Defendant, and counsel's scheduling conflicts should not be weighed against the State.
 

 The primary cause of Defendant's delayed trial was a backlog at the State Bureau of Investigation's Crime Lab. The prosecution submitted evidence (including DNA evidence collected from Defendant after counsel was appointed to represent him in October 2013) to the Crime Lab for testing on 14 November
 
 *132
 
 2013. The Crime Lab did not issue test results for another 18 months, in May 2015. Although the prosecution submitted a "rush request" with the Crime Lab in January 2015, it was not until April 2015 that the evidence was first tested for the presence of blood and other bodily fluids. When asked why testing did not start for more than a year after the evidence was submitted, Martha Traugott, a forensic scientist with the Crime Lab, testified that "[i]tems are usually worked in the order that we receive them." Erin Ermish, another Crime Lab scientist, testified that she first received evidence gathered in this case on 7 May 2015 and proceeded to conduct a DNA analysis. That was a few weeks before the Crime Lab issued its report. Ms. Ermish acknowledged that the State had submitted a "rush request" in January 2015. Asked by counsel for Defendant if she could explain the long delay in testing, Ms. Ermish testified that "due to the number of cases that had previously been submitted that were waiting to be worked, this case would have been worked in order when it was-when we go to that number."
 

 When considering the factor of the reason for a delayed trial, "different weights should be assigned to different reasons."
 
 Barker
 
 ,
 
 407 U.S. at 531
 
 ,
 
 92 S.Ct. at 2192
 
 ,
 
 33 L.Ed.2d at 117
 
 . More specifically:
 

 A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily
 
 *268
 
 but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.
 

 Id
 
 .
 

 Defendant has not argued that the State deliberately delayed his trial, much less that the State delayed the trial to hamper his defense. Defendant concedes in his brief that "it is unclear the State had the ability to speed up" the testing process.
 

 The undisputed testimony by Crime Lab scientists regarding a backlog of evidence to be tested provides an explanation analogous to that offered in
 
 State v. Hammonds
 
 ,
 
 141 N.C.App. 152
 
 , 160,
 
 541 S.E.2d 166
 
 , 173 (2000), in which the trial court found that a congested court docket in Robeson County delayed the defendant's murder trial for more than four years following his arrest.
 
 Id.
 
 at 160,
 
 541 S.E.2d at 173
 
 . " 'Our courts have consistently recognized congestion of criminal court dockets as a valid justification for delay.' "
 

 Id.
 

 (quoting
 
 State v. Hughes
 
 ,
 
 54 N.C.App. 117
 
 , 119,
 
 282 S.E.2d 504
 
 , 506 (1981) ). Unlike the management of a criminal court docket, which is within the control of the prosecutor, the management of a backlog of evidence to be tested is within the control of a separate agency, in this case the State Bureau of Investigation. While we acknowledge the holding in
 
 Barker
 
 that governmental responsibility for delay should be weighed against the State, Defendant has failed to make a
 
 prima facie
 
 showing that either the prosecution or the Crime Lab negligently or purposefully underutilized resources available to prepare the State's case for trial. For these reasons, we conclude that the 18 months used by the Crime Lab to process forensic testing of evidence in this case was a neutral reason for Defendant's delayed trial.
 
 See also
 

 State v. Goins
 
 ,
 
 232 N.C.App. 451
 
 , 453,
 
 754 S.E.2d 195
 
 , 198 (2014) (concluding that a backlog at the Crime Lab was among "neutral" reasons for delay of the defendant's trial). Accordingly, this factor of the
 
 Barker
 
 analysis does not weigh in favor of Defendant.
 

 C.
 
 Defendant's Assertion of His Right to a Speedy Trial
 

 The third factor to consider is whether and when a criminal defendant has asserted his right to a speedy trial. "The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right."
 
 Barker
 
 ,
 
 407 U.S. at 531-32
 
 ,
 
 92 S.Ct. at 2193
 
 ,
 
 33 L.Ed.2d at 117-18
 
 . A defendant is
 
 *269
 
 not required to assert his right to a speedy trial in order to make a speedy trial claim on appeal.
 
 *133
 

 Grooms
 
 ,
 
 353 N.C. at 63
 
 ,
 
 540 S.E.2d at 722
 
 . But a defendant's failure to assert his speedy trial right, or his failure to assert the right sooner in the process, "does weigh against his contention that he has been denied his constitutional right to a speedy trial."
 
 Id
 
 . Here, Defendant first asserted his speedy trial right more than a year after he was arrested, and he did not properly
 
 [2]
 
 assert his right until October 2015-more than two years after his arrest, after the State had obtained forensic test results from the Crime Lab, after the trial court had set the case for trial, and after Defendant's trial counsel had requested the trial date be continued. The eleventh-hour nature of Defendant's speedy trial motion carries minimal weight in his favor.
 

 D.
 
 Prejudice to Defendant
 

 The final factor to consider is prejudice to Defendant caused by the delay between his arrest and trial. "A defendant must show actual, substantial prejudice."
 
 Spivey
 
 ,
 
 357 N.C. at 122
 
 ,
 
 579 S.E.2d at 257
 
 . The constitutional right to a speedy trial addresses three concerns: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."
 
 Grooms
 
 ,
 
 353 N.C. at 63
 
 ,
 
 540 S.E.2d at 722
 
 (citations and quotation marks omitted). Of these concerns, most important "is whether the prosecutor's delay hampered defendant's ability to present his defense[.]"
 
 State v. Hughes
 
 ,
 
 54 N.C.App. 117
 
 , 120,
 
 282 S.E.2d 504
 
 , 506 (1981).
 

 In
 
 Hughes
 
 , the defendant contended that because of delay, he could no longer contact three alibi witnesses, but he presented no evidence about when the witnesses became unavailable.
 
 54 N.C.App. at 120
 
 ,
 
 282 S.E.2d at 506-07
 
 . This Court held that "[b]ecause [the] defendant has not demonstrated that his witnesses were available at any earlier time, we cannot conclude that the prosecutor's delay caused him prejudice."
 
 Id
 
 . at 120,
 
 282 S.E.2d at 507
 
 .
 

 *270
 
 Defendant here contends that several witnesses' memories were affected by the delay between his arrest and trial. For example, he notes that Mr. Herndon could not recall seeing Defendant wearing a bulletproof vest. Defendant contends that the lack of recall could have exculpated Defendant had it been presented when the witness's memory was clearer. However, without evidence that the witness would have testified more positively for Defendant at an earlier time, this Court can only speculate whether the lack of recall hampered the defense or the prosecution.
 
 See
 

 Barker
 
 ,
 
 407 U.S. at 534
 
 ,
 
 92 S.Ct. at 2194
 
 ,
 
 33 L.Ed.2d at 119
 
 (holding that the defendant's right to speedy trial was not violated when the trial transcript revealed only "very minor" memory lapses, and noting that one lapse was by a prosecution witness). Defendant also contends that because he was incarcerated, he was unable to confer adequately with his counsel. However, given Defendant's inability to obtain release on bond, we cannot conclude that Defendant would have obtained noncustodial contact with his counsel had his trial proceeded sooner.
 

 Considering all of the
 
 Barker
 
 factors, we conclude that Defendant has failed to show that his constitutional right to a speedy trial was violated. We therefore affirm the trial court's denial of Defendant's motion to dismiss on that ground.
 

 II.
 
 Acting in Concert
 

 Defendant argues that the trial court erred in denying his motion to dismiss the charge of assault with a deadly weapon inflicting serious injury, because the evidence was insufficient to support that charge against him. We disagree.
 

 We review
 
 de novo
 
 a trial court's denial of a defendant's motion to dismiss.
 

 *134
 

 State v. Smith
 
 ,
 
 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007). The test is "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator."
 
 State v. Fritsch
 
 ,
 
 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (2000) (quotation marks and citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Smith
 
 ,
 
 300 N.C. 71
 
 , 78-79,
 
 265 S.E.2d 164
 
 , 169 (1980). We review the evidence in the light most favorable to the State, drawing every reasonable inference in the State's favor.
 
 State v. Rose,
 

 339 N.C. 172
 
 , 192,
 
 451 S.E.2d 211
 
 , 213 (1994). On the other hand, evidence which raises no more than a surmise, suspicion, or conjecture of guilt is insufficient to withstand the motion to dismiss even though the suspicion so aroused by the evidence is strong.
 
 State v. Evans
 
 ,
 
 279 N.C. 447
 
 , 453,
 
 183 S.E.2d 540
 
 , 544 (1971).
 

 *271
 
 If there is substantial evidence-whether direct, circumstantial, or both-to support a finding that the offense charged has been committed and that the defendant is the perpetrator, the motion to dismiss should be denied.
 
 State v. McNeil
 
 ,
 
 359 N.C. 800
 
 , 804,
 
 617 S.E.2d 271
 
 , 274 (2005). When considering circumstantial evidence,
 

 the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty.
 

 State v. Thomas
 
 ,
 
 296 N.C. 236
 
 , 244,
 
 250 S.E.2d 204
 
 , 209 (1978) (citations omitted).
 

 To withstand a motion to dismiss a charge of assault with a deadly weapon inflicting serious injury, the State must produce substantial evidence that the defendant (1) assaulted the victim, (2) with a deadly weapon, (3) inflicting serious injury.
 
 State v. Allen
 
 ,
 
 193 N.C.App. 375
 
 , 378,
 
 667 S.E.2d 295
 
 , 297-98 (2008). The term "serious injury" is defined by statute as physical or bodily injury resulting from an assault with a deadly weapon.
 
 State v. Wallace
 
 ,
 
 197 N.C.App. 339
 
 , 347-48,
 
 676 S.E.2d 922
 
 , 928 (2009) ;
 
 see also
 

 N.C. Gen. Stat. § 14-32
 
 (2015).
 

 Here, jurors were provided sufficient evidence from which they could reasonably infer all of the factual elements of the charge against Defendant. Evidence that Mr. Sutton was shot three times with a gun and required hospitalization and surgery for his wounds satisfies the elements of assault with a deadly weapon and infliction of serious injury. The closer question is whether the evidence was sufficient to allow a reasonable inference that Defendant was a perpetrator of the crime.
 

 It is undisputed that Mr. Robinson, and not Defendant, shot Mr. Sutton. So Defendant could only be found guilty of assaulting Mr. Sutton with a deadly weapon inflicting serious injury based upon a theory of acting in concert. The theory of acting in concert extends criminal liability to a person who, although not the perpetrator of a crime, joins with the perpetrator in a common purpose which results in the crime.
 

 If two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose ... or as a natural or probable consequence thereof.
 

 *272
 

 State v. Mann
 
 ,
 
 355 N.C. 294
 
 , 306,
 
 560 S.E.2d 776
 
 , 784 (2002) (citations omitted).
 

 The evidence presented at trial established the following facts: Defendant and Ms. Sutton, who lived in Fayetteville, drove on a Thursday to Mr. Sutton's residence in Jacksonville, where the Suttons engaged in a dispute over custody of their children until police arrived and required Defendant and Ms. Sutton to leave without the children. The next evening, Defendant drove his vehicle, along with Mr. Robinson and Ms. Sutton, from Fayetteville back to Mr. Sutton's residence in Jacksonville, carrying in the vehicle firearms, bulletproof vests, and walkie talkie radios that were turned on and set to the same channel. The vehicle was waiting in Mr. Sutton's apartment parking lot when he arrived home that evening. Mr. Robinson, who did not know Mr. Sutton, shot Mr. Sutton and asked him if he wanted to die. Defendant
 
 *135
 
 assisted Mr. Robinson in restraining Mr. Sutton, placed a handcuff on one of Mr. Sutton's wrists, tried without success to cuff both of Mr. Sutton's wrists, searched Mr. Sutton's pockets, and escorted the Suttons' children from Mr. Sutton's apartment to the vehicle where Ms. Sutton was waiting. After neighbors found Mr. Sutton bleeding from gunshot wounds, Defendant sped away from the scene in the vehicle with Ms. Sutton, Mr. Robinson, and the children.
 

 This evidence allows a reasonable inference that Defendant brought Mr. Robinson to Jacksonville, armed and equipped with bulletproof vests and walkie talkies, to take the children away from Mr. Sutton by force. Taking children by force and against the will of their custodial parent is a crime. Although it may have been possible for Defendant to take the children without confronting Mr. Sutton, without using a gun, a bulletproof vest, or a walkie talkie to communicate with a partner, a natural consequence of the purpose included a confrontation and use of weapons and other equipment available to Defendant and Mr. Robinson at the crime scene.
 

 Defendant argues that absent evidence that he was "anywhere near" Mr. Robinson when the shots were fired "or in a position to assist or even waiting to assist" him during the shooting, the evidence was insufficient to show that he was present during the crime. We are unpersuaded. Mr. Sutton's blood was found on Defendant's pants. Defendant had traveled from another county for the second time in two days to visit the home of his girlfriend's estranged husband following a custody dispute. Defendant had in his possession several sets of handcuffs and a firearm. After Mr. Robinson first shot Mr. Sutton, and while Mr. Robinson and Mr.
 
 *273
 
 Sutton were struggling over the gun, Defendant aided Mr. Robinson in the assault. The North Carolina Supreme Court has held:
 

 One who procures or commands another to commit a felony, accompanies the actual perpetrator to the vicinity of the offense and, with the knowledge of the actual perpetrator, remains in that vicinity for the purpose of aiding and abetting in the offense and sufficiently close to the scene of the offense to render aid in its commission, if needed, or to provide a means by which the actual perpetrator may get away from the scene upon the completion of the offense, is a principal in the second degree and equally liable with the actual perpetrator.
 

 State v. Price
 
 ,
 
 280 N.C. 154
 
 , 158,
 
 184 S.E.2d 866
 
 , 869 (1971).
 

 It would have been reasonable for a finder of fact to infer from the evidence presented at trial that Defendant intended to assist his girlfriend in taking her children against the will of her estranged husband, that Defendant sought and obtained the assistance of Mr. Robinson, and that they brought to Mr. Sutton's address weapons and other equipment for the purpose of succeeding in the effort that had failed the previous day.
 

 Based on the reasonable inferences arising from the evidence presented at trial, we conclude that the trial court did not err in denying Defendant's motion to dismiss the charge of assault with a deadly weapon inflicting serious injury.
 

 III.
 
 Bulletproof Vest Enhancement
 

 Defendant argues that the trial court erred in denying his motion to dismiss the charge that he committed assault while wearing or having in his immediate possession a bulletproof vest. We disagree.
 

 Mr. Sutton testified at trial that he could not see what Defendant was wearing during the assault, but that when he punched Defendant's chest, it felt padded. A police officer who interviewed Mr. Sutton at the hospital testified that Mr. Sutton told him both attackers wore bulletproof vests. Police who stopped Defendant's vehicle immediately following the shooting found a bulletproof vest lying on the floor of the front passenger side of the vehicle where Defendant was sitting. This evidence was sufficient to allow a reasonable inference that Defendant either wore or had in his immediate possession a bulletproof vest during the assault. For this reason, the trial court did not err in denying Defendant's motion to dismiss the enhancement charge.
 

 *136
 

 *274
 

 Conclusion
 

 For all of the reasons explained above, we conclude that the trial court did not violate Defendant's constitutional right to a speedy trial and that Defendant has failed to demonstrate any error in his trial.
 

 NO ERROR.
 

 Judges DAVIS and ENOCHS concur.
 

 [1]
 

 In a motion filed 2 October 2015 Defendant's counsel asserted that the bond amount was $750,000. The record does not include a bond order entered by the trial court.
 

 [2]
 

 Defendant filed a
 
 pro se
 
 motion to dismiss claiming that his right to a speedy trial had been violated on 30 March 2015. "Having elected for representation by appointed defense counsel, defendant cannot also file motions on his own behalf or attempt to represent himself. Defendant has no right to appear both by himself and by counsel."
 
 Grooms
 
 ,
 
 353 N.C. at 61
 
 ,
 
 540 S.E.2d at
 
 721 ;
 
 see also
 

 Spivey
 
 ,
 
 357 N.C. at 121
 
 ,
 
 579 S.E.2d at 256
 
 (holding that where the defendant was represented by counsel throughout his pretrial incarceration, and counsel did not file a speedy trial motion for nearly three years after the defendant's arrest, the "defendant's
 
 pro se
 
 assertion of his right to a speedy trial is not determinative of whether he was denied the right[ ]").