IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-1161

Filed 31 December 2024

Rowan County, Nos. 12CRS53790, 17CRS1726-28

STATE OF NORTH CAROLINA

v.

KHALIL ABDUL FAROOK, Defendant.

Appeal by defendant from judgments entered 10 October 2018 by Judge Anna Mills Wagoner and order entered 9 March 2023 by Judge Michael D. Duncan in Superior Court, Rowan County. Heard in the Court of Appeals 11 June 2024.

*Attorney General Joshua H. Stein, by Assistant Attorney General John W. Congleton, for the State.*

*Sarah Holladay for defendant-appellant.*

STROUD, Judge.

Defendant appeals from judgments convicting him of felony hit and run inflicting serious injury or death, two counts of second-degree murder, and attaining violent habitual felon status, contending there was insufficient evidence of malice to support the second-degree murder convictions. Defendant further argues the charges against him should have been dismissed since his constitutional right to a speedy trial was violated. Finally, Defendant contends he received ineffective assistance of counsel when his trial attorney conceded his guilt to some of the charges without Defendant's consent. For the following reasons, we affirm in part and reverse and

remand in part.

## I. Background

The State's evidence tended to show that on 17 June 2012, Defendant was driving his car in Rowan County, North Carolina when he "crossed the center line and collided with a motorcycle driven by Tommy Jones with passenger Suzette Jones." Both Tommy and Suzette Jones died as a result of this collision. Miguel Palacios was driving his car when he witnessed the aftermath of the collision and pulled over to attempt to render aid. Mr. Palacios testified that Tommy Jones was already dead when he first saw him after the crash but Suzette Jones was still breathing. Mr. Palacios stated Defendant got out of his car, looked at the two bodies, got back in his car, and then started walking away from the scene of the crash. Mr. Palacios attempted to follow Defendant but eventually lost him.

Deputy Ashley Goodman with the Rowan County Sheriff's Office responded to the scene of the crash and was informed Defendant fled on foot; Deputy Goodman started to canvas the area to locate Defendant. Deputy Goodman had Defendant's name and description.[1] Deputy Goodman was heading toward an address that may have belonged to Defendant when he noticed a man matching Defendant's description walking near the road. Deputy Goodman asked for Defendant's identification, which provided the name Khalil Farook, and when asked if Defendant knew "Donald

---

[1] Law enforcement initially identified Defendant as Donald Miller, the name Defendant used before changing his name to Khalil Farook.

Miller," Defendant responded he did not. Deputy Goodman noticed "a strong odor of an alcoholic beverage coming from [Defendant's] breath[,]" Defendant was "swaying, shifting his weight left to right[,]" and had slurred speech. As Deputy Goodman did not know at the time Khalil Farook and Donald Miller were the same person, he was released at that time. Law enforcement later learned Defendant was Donald Miller and was now going by the name Khalil Farook. Defendant turned himself in approximately two days later.

Defendant was "initially charged with Felony Hit and Run resulting in Death, DWI, and Resisting an Officer." Defendant was then charged with "two additional charges of Felony Death by Vehicle." Defendant was placed in jail on the day of his arrest, 19 June 2012, and was not subsequently released before his trial on 8 October 2018. Defendant was later indicted on 2 July 2012 and 30 July 2012 for "Reckless Driving, Resisting an Officer, two counts of Felony Death by Vehicle, Reckless Driving to Endanger, Left of Center, Driving While License Revoked, and Felony Hit and Run resulting in two deaths." Mr. James Randolph was appointed to represent Defendant on 11 July 2012, but on 6 August 2012 Mr. Randolph was "allowed to withdraw, and Mr. James Davis was appointed" to represent Defendant. The State produced discovery to Mr. Davis on 5 December 2012 and Mr. Davis sent a letter to the DA's office requesting time to review the discovery. On 12 July 2013, Defendant sent a letter to the trial judge explaining he had been in confinement for nearly a year and asking for the discovery in his case. The trial judge sent a letter back to

Defendant explaining that since he was represented by an attorney "[i]t is inappropriate to write ex parte letters to any individual presiding judge."

On 26 June 2012, Rowan County Assistant District Attorney Seth Banks "made a rush request for DNA results" but "the submission was returned because the known standard from [D]efendant was . . . not submitted." On 28 June 2012, a sample of Defendant's blood was sent to the North Carolina Crime Lab for alcohol and drug testing. After ADA Banks resigned, ADA Barrett Poppler took over the case. The DNA from Defendant was not resubmitted to the Crime Lab "with known standard" until 10 July 2014 but ADA Poppler "did not ask for a rush request" since "it was his understanding from the State Crime Lab that a rush request should not be made unless there was a pending trial date." "District Attorney Brandy Cook emailed the Director of the North Carolina Crime Lab" on 26 March 2015 to inquire about the results of the DNA testing; the "DNA results were completed on" 17 April 2015, nearly three years after the date of Defendant's arrest. The blood alcohol testing "c[a]me back from the North Carolina Crime Lab" on 9 March 2015.

On 15 July 2015, "Defendant appeared on the Criminal Administrative Calendar for the first time since labs came back." On 13 January 2016, Defendant sent a letter to United States District Court Judge Loretta Biggs again stating he had been in confinement for several years and that his due process rights were being infringed. Defendant did not specifically demand a speedy trial in this letter; the federal district court "construed [the letter] as a habeas petition" and dismissed it

- 4 -

without prejudice on 2 March 2016. Defendant filed another letter in the same federal court in February 2016 mainly alleging the same as his January 2016 letter; this February 2016 action was dismissed on 19 April 2016. Defendant sent another letter to US District Court Judge Biggs in August 2017, stating his Fifth, Eighth, and Fourteenth Amendment rights were violated and that this was a "vindictive prosecution" and "prosecutorial misconduct[.]" Defendant did not demand a speedy trial under the Sixth Amendment in this letter and the federal court again dismissed this complaint.

On 27 June 2016, DA Cook sent Defendant's attorney a letter advising the Conference of District Attorneys would be handling the case moving forward, specifically Sarah Garner and Aaron Berlin. On 11 April 2017, Ms. Garner sent a formal plea offer to Mr. Davis. Between April and July 2017, Ms. Garner repeatedly reached out to Mr. Davis to discuss the status of the plea offered on 11 April. On 5 July 2017, Mr. Davis was allowed to withdraw as Defendant's attorney, Mr. David Bingham was appointed, and Defendant rejected the plea offer. Then, on 17 July 2017, Defendant was indicted "for two counts of second-degree murder, habitual felon status, and violent habitual felon status." On 25 September 2017, after previously filing two motions to withdraw, Mr. Bingham was allowed to withdraw and Mr. Christopher Sease was appointed to represent Defendant. The trial court entered an order on 1 October 2017 "setting [a] deadline for motions on December 4, 2017 and a hearing on all motions for January 27, 2018."

On 19 March 2018, Defendant sent a letter to the Rowan County Clerk of Court's office seeking a copy of any motions filed in his cases and requesting information "as to why his trial was delayed from 2013 to 2017. [The] Clerk responded . . . that there were no motions." On 6 September 2018, Defendant filed a *pro se* motion alleging he was denied effective assistance of counsel stating his attorney, Mr. Davis, had not visited him in jail until 2 March 2017. About a week later, on 13 September 2018, Defendant filed another *pro se* motion alleging ineffective assistance of counsel against one of his other previous attorneys, Mr. Bingham. The 13 September *pro se* motion also argued a speedy trial violation as a reason to dismiss.

On 18 September 2018, Defendant's attorney, Mr. Sease, filed a motion to dismiss for a speedy trial violation. Essentially, Defendant contended that even though the date of the offense was in June 2012, he "was not charged with nor served with the warrants for Second Degree Murder, Violent Habitual Felon, and Habitual Felon" until July 2017. Defendant alleged since he was in the Rowan County jail since his arrest in 2012, he was not the cause of the delay and the 2017 indictments were "purposely held until after [ ]he had rejected the State's plea offer and after his original counsel of record had withdrawn from his case, in an attempt to oppress, harass and punish him further." Defendant's motion also included a detailed account of the dates of various events in the case since the alleged crime occurred. This Court's previous opinion condensed those dates into a timeline helpful for this Court's

review:

> 31 July, 2012 Indictment.
>
> 6 August 2012 Case was calendared for this week but Mr. Randolph, counsel, withdrew.
>
> 8 August 2012 Mr. Davis appointed as counsel.
>
> 13 August 2012 Defendant entered not guilty plea.
>
> 18 February 2013 Defendant's case was calendared but not reached.
>
> 19 March 2013 Defendant's case was calendared but not reached.
>
> 16 April 2013 Defendant's case was calendared. New assistant district attorney was assigned to the case.
>
> 15 July 2015 Defendant's case was calendared but not reached.
>
> 13 February 2017 Defendant's case was calendared but not reached. Assistant District Attorney was released from the case, and it was assigned to the Conference of District Attorneys.
>
> 5 July 2017 Defendant was indicted for second degree murder, habitual felon, and violent habitual felon. Defendant's case was calendared for the week and not reached. Mr. Bingham was appointed as [D]efendant's counsel and Mr. Sease was appointed to aid Mr. Bingham in going through discovery.
>
> 29 August 2017 Defendant's case was calendared but not reached.
>
> 26 September 2017 Defendant's case was calendared and not reached. Mr. Bingham withdrew and Mr. Sease became [D]efendant's attorney.
>
> 8 January 2018 Defendant's case was calendared but not

reached. A tentative trial date was set for September 2018.

*State v. Farook*, 274 N.C. App. 65, 69-70, 850 S.E.2d 592, 598 (2020) (footnotes omitted), *rev'd in part and aff'd in part*, 381 N.C. 170, 871 S.E.2d 747 (2022).

Defendant ultimately claimed he "has been prejudiced by an inability to adequately assist his defense attorney in preparation for his trial" and was thus unable "to locate any possible witnesses for the defense." The trial court heard Defendant's motion to dismiss on 24 September 2018 and entered an order denying the motion on 8 October 2018 *nunc pro tunc* 24 September 2018.

On 24 September 2018, the trial court heard various pretrial motions, including *Harbison* admissions by Defendant. Defendant's attorney stated to the trial court that Defendant was "willing to concede certain elements" including that he was driving the car at issue, that the victims died as a result of the collision, and that Defendant's driver's license was revoked for an impaired driving revocation. The trial court engaged in a colloquy with Defendant asking if his attorney had permission to concede these elements, that he understood he was conceding the elements and that as a result the State would not have to prove these elements beyond a reasonable doubt. Defendant answered in the affirmative to each question.

Defendant's case finally came on for trial on 8 October 2018. During closing arguments, Mr. Sease stated to the jury, "we ask you to find [Defendant] guilty of misdemeanor death by motor vehicle" and "we're not, as a defense, not asking you to find him not guilty of anything. We're asking you to find the most appropriate, which

is the lesser included . . . misdemeanor offenses of both of these crimes." The trial court engaged in another *Harbison* inquiry with Defendant after trial, confirming he gave Mr. Sease permission to concede the elements previously discussed and that Defendant left the scene of the crash. The jury found Defendant guilty of "feloniously failing to remain at the scene of a crash resulting in serious injury or death" and two counts of second-degree murder. Defendant subsequently entered a guilty plea to the violent habitual felon charge and judgments were entered. Defendant appealed and this Court reversed his conviction on speedy trial grounds in *Farook*, 274 N.C. App. 65, 850 S.E.2d 592; our Supreme Court reversed in part, affirmed in part, and remanded for a new hearing in *Farook*, 381 N.C. 170, 871 S.E.2d 747.

On or about 3 October 2022, the trial court held a new hearing on Defendant's motion to dismiss on speedy trial grounds. The trial court heard extensive testimony, specifically addressing the State's reasons for the delay in Defendant's trial, among other factors, and entered an order denying Defendant's motion on 9 March 2023. Defendant appeals the order denying his motion to dismiss on speedy trial grounds and the underlying judgments.

## II. Speedy Trial

Defendant first argues "where the primary reason for the six-year delay in bringing [Defendant's] case to trial was a backlog in the courts, which the remand court failed to weigh against the State, the remand court erred in concluding that [Defendant's] right to a speedy trial was not violated." (Capitalization altered.)

> We review an alleged violation of a defendant's Sixth Amendment right to a speedy trial de novo. In reviewing the denial of a motion to dismiss for a speedy-trial violation, we review the superior court's order to determine whether the trial judge's underlying findings of fact are supported by competent evidence and whether those factual findings in turn support the judge's ultimate conclusions of law. In reviewing the conclusions of law, we consider the matter anew and substitute our judgment for that of the trial court.

*State v. Spinks*, 277 N.C. App. 554, 561, 860 S.E.2d 306, 314 (2021) (citations, quotation marks, and brackets omitted).

The Sixth Amendment to the United States Constitution provides "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. Our North Carolina State Constitution further protects a criminal defendant's right to a speedy trial, stating "[a]ll courts shall be open . . . and right and justice shall be administered without favor, denial, or delay." N.C. Const. Art. 1, § 18.

> The Supreme Court of the United States laid out a four-factor balancing test to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated. These factors are: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.

*Spinks*, 277 N.C. App. at 562, 860 S.E.2d at 314-15 (citations and quotation marks omitted). These factors are commonly referred to as the *Barker* factors, as they were established in *Barker v. Wingo*, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 117 (1972).

**A. Length of the Delay**

Defendant previously appealed the denial of his speedy trial motion, and our Supreme Court issued an opinion on 6 May 2022 stating, as to the length of the delay, "a delay of over six years is 'extraordinarily long,' 'striking,' and 'clearly sufficient to raise a presumption that defendant's constitutional right to a speedy trial may have been breached.'" *Farook*, 381 N.C. at 179, 871 S.E.2d at 747 (citation and brackets omitted). As our Supreme Court recognized and is undisputed in this case, Defendant "was incarcerated for 2,302 days – six years and three months – without a trial." *Id.* at 179, 871 S.E.2d at 746. Our Supreme Court stated "[t]he over six-year delay in this case must therefore be considered unreasonable and presumptively prejudicial within the meaning of the Sixth Amendment and is clearly sufficient to shift the burden of proof to the State to rebut and offer explanations for the delay." *Id.* at 179, 871 S.E.2d at 747 (citation and quotation marks omitted).

In the trial court's order on remand, it recognized the length of delay in conclusion of law 3: "The length of delay over 6 years is sufficient enough to trigger analysis of the Barker speedy trial factors." Nonetheless, Defendant contends "[t]he remand court erred in not weighing this factor heavily in [Defendant's] favor." As was recognized by our Supreme Court and the remand court, the length of delay of over six years is presumptively prejudicial to Defendant. *See id.* However, Defendant contends the trial court erred by failing to give the length of the delay proper weight, stating that "despite clear command of precedent from ou[r] Supreme Court and the U.S. Supreme Court, the remand court gave no weight to the fact that the pretrial

delay in this case was extraordinarily long" and that in addition to triggering a full analysis of the *Barker* factors, the length of delay is also significant since "it must be weighed together with those factors to determine whether a violation has occurred."

But the remand court gave the length of the delay proper consideration; the Supreme Court's opinion did not direct the remand court to give any specific weight to this factor other than triggering the *Barker* inquiry and shifting the burden of proof to the State. *See id.* The remand court properly concluded the length of delay triggered an analysis of all four *Barker* factors, *see id.*, and concluded "[t]he [c]ourt, in its evaluation and balancing of the four factors enumerated in Barker v. Wingo, concludes as a matter of law that [D]efendant's right to a speedy trial has not been violated." The remand court also found "it is proper to assign the shifted burden to the State to show the reasons for the delay." Thus, as the remand court and this Court are bound by our precedent, there is no question the six-year delay here is presumptively prejudicial and requires we weigh all four *Barker* factors; further, the extraordinary delay weighs in favor of Defendant, but that does not end the inquiry and the other three factors must be examined to decide if this factor, even weighing in favor of Defendant, is outweighed by the remaining factors. *See id.*

**B. Reasons for the Delay**

Defendant disputes multiple findings and conclusions made by the remand court on this factor, specifically conclusion of law 5, which states "[t]he State's reasons for the delay in the trial of [D]efendant's cases are reasonable and valid justifications

for delay in this case." Defendant also disputes findings 84, 106, 110, 115, 117 and conclusions 4-10. As Defendant groups his challenges to these findings and conclusions by the reason for delay, we will address each challenged finding similarly. Further, since the challenges to the trial court's conclusions of law deal with the reasons for delay generally, we will address those conclusions after analyzing each reason discussed.

Our Supreme Court, citing *Barker*, "recognizes four categories of reasons for delay: (1) deliberate delay on the part of the State, (2) negligent delay, (3) valid delay, and (4) delay attributable to the defendant." *Id.* at 180, 871 S.E.2d at 747 (citation omitted). The Court first defined a "deliberate delay[,]" which should be weighed heavily against the State, as "an attempt to delay the trial in order to hamper the defense, or to gain some tactical advantage over a defendant or to harass them[.]" *Id.* (citations, quotation marks, and brackets omitted). "A more neutral reason such as negligent delay or a valid administrative reason such as the complexity of the case or a congested court docket is weighted less heavily against the State than is a deliberate delay." *Id.* (citation omitted). Nonetheless, "such neutral circumstances do not necessarily excuse delay and speedy trial claims . . . should be considered when there is a neutral reason for the delay, since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* (citations and quotation marks omitted). The third category is a valid delay, such as a "delay caused by difficulty in locating witnesses" which "serves to justify

appropriate delay." *Id*. (citation omitted). Finally, "delays occasioned by acts of the defendant or on his or her behalf are heavily counted against the defendant and will generally defeat his or her speedy trial claim." *Id*. at 180, 871 S.E.2d at 747-48 (citation omitted).

### 1. *Backlog in the Courts*

Defendant contends the remand court should have weighed this factor against the State instead of treating it as neutral. Finding 106 a. states "[t]he State presented evidence and reasons for the delay: a. The number of pending cases in Rowan County." Defendant also challenges finding 84, which states:

> 84. Ms. Garner did nothing to delay [D]efendant's case from being tried. Ms. Garner took the necessary steps to move this case to trial once [D]efendant rejected the formal plea offer. Any delay from the date Ms. Garner was assigned to the case until the plea offer was rejected does not weigh against the State or [D]efendant. At most, plea negotiations are a neutral and explainable reason for the delay.

Defendant argues Ms. Garner "testified her workload as a Resource Prosecutor was so heavy that almost eight months passed after her appointment before she had time to visit the victims' famil[ies], which was a prerequisite to her making a formal plea offer[,]" and "[t]his testimony contradicts the remand court's finding that none of the delay following Ms. Garner's appointment could be weighed against the State." Ms. Garner was appointed to handle this case in June 2016 and Ms. Garner testified that she met with the victims' families in April 2017. The plea offer was made 11

April 2017. Defendant's characterization of the reason Ms. Garner could not speak to the families for eight months is correct: Ms. Garner specifically stated the reason for the delay was "[a]t the time I had quite a few other cases that I was handling in various jurisdictions." Ms. Garner also stated she was not in a position to make a plea offer until she spoke with the families; it took 8 months for her to speak to them. Some portion of this delay may be reasonable, as Ms. Garner would need some time to become familiar with the case before making a plea offer, but the description as "plea negotiations" does not address the entire time. The evidence does not indicate that the entire time period from Ms. Garner's appointment until the offer of the plea was attributable to "plea negotiations" as finding 84 states. As the delay from Ms. Garner's appointment in June 2016 to the time of the plea offer in April 2017 was due to Ms. Garner's backlog of her own cases, we will weigh this appropriately in this discussion as to the backlog of courts and will not consider the delay from June 2016 to April 2017 a result of "plea negotiations."

Concerning the backlog of cases in Rowan County generally, we determined above in our discussion on the length of the delay, the substantial delay between Defendant's arrest and trial requires the burden to shift to the State to demonstrate reasons for the delay. *See id.* at 179, 871 S.E.2d at 747. The underlying facts making up this argument are largely undisputed. The elected District Attorney for Rowan County testified at the remand hearing and stated in 2011 Rowan County had a backlog of cases of 3,008 in Criminal Superior Court from June 2009 through June

2010 and 3,006 cases from June 2010 to June 2011. The remand court also found "according to the Administrative Office of the Courts, Rowan County District Attorney's Office was listed as 80.9% of the workload to staff ratio and based upon that ratio they were one of the lowest funded District Attorney's Office[s] in the State." Further, the Rowan County District Attorney's Office had 8 assistant district attorneys, and "5 were assigned to Superior Court" and "each Superior Court ADA averaged approximately 601 cases as their caseload" while the State average in North Carolina was 357 cases. Rowan County eventually brought in the resource prosecutor from the Conference of District Attorneys in June 2016.

In *State v. Farmer*, our Supreme Court stated

> [t]he nation's highest court is clear that, while different reasons for delay in a criminal trial's execution should be weighed in appropriate increments, a reason such as crowded criminal case dockets—expressly cited by the Supreme Court of the United States in *Barker* and offered as a reason for delay by the State in the instant case—while largely neutral and hence weighted less heavily against the State than a more intentional effort to prejudice a defendant with a delay, nonetheless must be borne by the State rather than by the defendant, since the State bears the responsibility for such a lag in time.

376 N.C. 407, 416, 852 S.E.2d 334, 341-42 (2020). The Court went on to explain it would "refrain from characterizing the State's prosecutorial backlog and usage of prosecutorial resources as being demonstrable of neglect or willfulness in its delay of scheduling [the] defendant's trial, we recognize that we have repeatedly held that overcrowded dockets and limited court sessions are valid reasons excusing delay." *Id.*

at 416, 852 S.E.2d at 342 (citations omitted).

Similarly, it is undisputed there was a significant delay in this case; however, it is also undisputed that the Rowan County District Attorney's Office had a significant backlog in its cases due to low funding and a shortage of staff. As finding of fact 106 merely states the State presented evidence that the backlog in the courts was a reason for the delay, the finding is supported by competent evidence. Finding 84 is unsupported as it identifies the delay between Ms. Garner's appointment and the formal plea offer as neutral reasons for delay since there were ongoing plea negotiations, but Ms. Garner testified she was unable to meet with the victims' families due to her own caseload. Finally, following our Supreme Court in *Farmer*, as the State produced evidence as to the reason of delay, we cannot conclude the backlog of cases was due to neglect or willfulness, but we nonetheless conclude this reason for delay "slightly, but firmly, weighs in the favor of [D]efendant." *Id.*

### 2. *Backlog in the State Crime Lab*

Defendant next asserts "the fact that the Lab was so under-resourced that it routinely took years to process DNA results is a finding of fact properly weighed against the State, and the remand court erred in finding that lab delays rebutted either the presumption of negligence or the presumption of prejudice" and "the record does not support the remand court's characterization" that the "State Crime Laboratory did not produce test results 'for almost three years, despite several rush requests.'" Defendant also challenges finding of fact 16, which states "ADA Seth

Banks never intentionally delayed the trial of [D]efendant's cases" since "Seth Banks did not testify, and as such there was no evidence of his intentions."

As to finding 16, even though ADA Banks did not testify, the record shows he sent a prompt rush request to the Lab to expedite analysis of the DNA in June 2012; delivered the discovery to Mr. Davis by December 2012; Mr. Davis sent a letter in January 2013 asking for additional time to review the discovery and prepare the case; Defendant then appeared on two administrative calendars in March and April 2013, and shortly after ADA Banks left the DA's office. Even without ADA Banks's testimony, this evidence is sufficient for the trial court to conclude ADA Banks did not intentionally delay Defendant's trial. The finding regarding ADA Banks is supported by the evidence.

The trial court made several findings regarding the backlog in the Lab and the State's efforts to test the blood and DNA:

> 6. [The State] made a rush request for DNA results on June 26, 2012, but the submission was returned because the known standard from . . . [D]efendant was not also submitted.
>
> . . . .
>
> 16. ADA Seth Banks never intentionally delayed the trial of [D]efendant's cases.
>
> 17. When ADA Poppler received the case, it was not ready for trial as he was awaiting lab results. ADA Poppler and [Defendant's counsel] or members of his law firm had numerous conversations early on about [D]efendant's case. . . . ADA Poppler and [Defendant's counsel] essentially

agreed that they were in a holding pattern until they got labs back. . . .

18. July 10, 2014, DNA was resubmitted with known standard from [D]efendant. [The State] did not ask for a rush request. [The State] indicated that it was [its] understanding from the State Crime Lab that a rush request should not be made unless there was a pending trial date. [The State] testified that if everyone sent in a rush request for every case it would further delay the labs in all cases. [The State] stated that back in 2012 through 2015 labs were taking years and "we all knew that."

. . . .

21. March 9, 2015, blood alcohol labs came back from the North Carolina Crime Lab.

22. District Attorney Brandy Cook emailed the Director of the North Carolina Crime Lab, John Byrd, on March 26, 2015 to inquire about the DNA and asked it be expedited.

23. DNA results were completed on April 17, 2015.

. . . .

107. . . . b. The Lab Results were not provided by the State's Crime Laboratory for almost three years, despite several rush requests.

. . . .

110. The number of pending case[s] in Rowan County and the length of time to obtain the lab results (Blood/Alcohol and DNA) can not be weighed against [D]efendant.

As to the time the Lab had Defendant's DNA sample, Defendant contends "[t]he actual time the Lab was in possession of [Defendant's] DNA was less than a year, not the three years attributed to it by the remand court." Our review of the

- 19 -

timeline the Lab had Defendant's DNA sample is complicated as the evidence does not show the date the Lab sent the sample back to law enforcement between the time of submission on 26 June 2012 and the resubmission on 10 July 2014. In any event, the State's first DNA submission to the Lab on 26 June 2012 was incomplete because the known standard from Defendant was not also submitted. As a practical matter, the sample could not be tested until the time of the resubmission on 10 July 2014. After resubmission, the Lab returned the DNA test results on 17 April 2015. Thus, the delay in processing the DNA test by the Lab was only about 9 months after the DA's resubmission of the DNA to the Lab.

The record does not indicate why the first DNA test request sent to the Lab was incomplete, but the burden is on the State to provide evidence as to the reasons for delay. *See Farook*, 381 N.C. at 179, 871 S.E.2d at 747. Based upon the evidence, about nine months of the delay can be attributed to the backlog at the Lab, but the State did not explain the reasons for the remainder of the three years of delay. Therefore, the evidence does not support the trial court's finding that the Lab had the DNA for 3 years.

This Court confronted a similar issue in *State v. Washington*, where "the record show[ed] that much of the delay was caused by the State's failure to submit its physical evidence to the SBI lab to be examined." 192 N.C. App. 277, 284, 665 S.E.2d 799, 804 (2008). In *Washington*, the defendant was arrested in May 2002 and indicted in August 2002, and between August 2002 to May 2003 the defendant "moved the

court four times to reduce [the] defendant's bond" and the trial court "directed the

State to proceed with the testing as expeditiously as possible." *Id.* However,

> [b]y 20 July 2006, the case had appeared on at least three trial calend[a]rs, but was continued at the request of the State because the SBI had not performed the necessary tests on the evidence. Thus, it is clear that at least 49 months of the delay, from 30 May 2002 to 20 July 2006, is attributable to the State's continuances, pending SBI testing of the evidence.
>
> According to SBI lab reports, however, the black purse, containing three exclusionary fingerprints, and the black toboggan, containing exclusionary DNA evidence, were not submitted to the SBI lab for analysis until 4 August 2005, which was more than three years after these items were collected.

*Id.* at 284-85, 665 S.E.2d at 804-05 (footnote omitted). This Court concluded "the

primary reason that the SBI did not complete its analysis of the State's evidence until

January of 2006 was not a neutral factor, but rather, was a factor wholly within the

prosecution's control: the prosecution's failure to submit the evidence to the lab prior

to August of 2005." *Id.* at 285, 665 S.E.2d at 805. Thus, the prosecutor in *Washington*

did not submit the evidence for three years after the defendant's arrest; in contrast,

here, the State did initially submit the blood and DNA samples in 2012, shortly after

Defendant's arrest. *See id.*

The State in *Washington* also failed to submit evidence of another potential

suspect to the Lab, which this Court concluded,

> Because the State did not make a request for such a comparison, the fingerprints obtained from the purse,

> which did not match [the] defendant, were not run through the system for comparison. Likewise, the State did not request that the mixture of DNA profiles obtained from the toboggan, none of which matched [the] defendant, be queried against the convicted offender indexes of the NCSBI State Database. We conclude that the State's failure to request that such comparisons be made is evidence of the State's repeated neglect of this case over the course of the prosecution.

*Id*. at 288, 665 S.E.2d at 806.

Finally, in *Washington*, this Court discussed the State's "[u]nderutilization of court resources:"

> the record shows that for nearly two years the Durham County District Attorney's Office failed to notify the SBI that it had been court ordered on 18 March 2004 to analyze the evidence; as such, the SBI lab did not comply with the order and did not conduct all of the tests mandated by Judge Stephens. As previously discussed, we note that even if the State had provided the SBI with a copy of Judge Stephens' Order in 2004, the SBI could not have tested the purse or toboggan at that time because the State did not submit those items to the lab for examination until August of 2005.

*Id*. at 288, 665 S.E.2d at 806-07. The SBI did not have a copy of the court order in its file and "four different SBI agents . . . testified that they were not provided with notice of the 2004 court order." *Id*. at 289, 665 S.E.2d at 807.

The State's actions, or lack thereof, in *Washington* demonstrated a clear case of negligence on behalf of the State. *See id*. In contrast, here, the State immediately submitted samples to the Lab in 2012, although the "submission was returned because the known standard from [D]efendant was not also submitted." Defendant

- 22 -

contends that by failing to include the "known standard" in the original sample, the State was negligent in its handling of Defendant's DNA. However, we note that the prosecution did not submit the original DNA sample to the crime lab, Trooper Deal with North Carolina State Highway Patrol did. ADA Banks submitted the accompanying rush request. A failure of the State Highway Patrol to submit the sample correctly would still be the fault of the State, but it does not demonstrate gross negligence comparable to the State's repeated total failures to submit evidence in the *Washington* case. *See id.* The record in this case is unclear when the DNA was returned from the Lab after the original submission in 2012, but it was not resubmitted until July 2014. This is an important omission as the weight to be given to Defendant in this factor could depend on the amount of time the DA's office had the samples back in its possession and thus the DA would have been aware of the need to resubmit the DNA. And the burden of proof is on the State at this point, *see Farook*, 381 N.C. at 179, 871 S.E.2d at 747, but the State failed to explain why the incomplete submission was not discovered and corrected sooner. We do recognize that the law enforcement agency and the prosecution separately sent the DNA sample and rush requests to the Lab, but as the first two years of that time was essentially wasted due to the incomplete submission in 2012, the State has failed to explain at least some level of negligence in this portion of the delay, although it does not rise to the level of negligence in the *Washington* case. *See Washington*, 192 N.C. App. at 288, 665 S.E.2d at 806-07.

Finally, the State attempts to place some of the blame for the delay in the Lab on Defendant, stating he did not request a trial and "was requesting additional undefined delays at this point." Unlike *Washington*, where the State was responsible for three continuances due specifically to the delay in the lab, for a total of 49 months delay, here Defendant's counsel received discovery and in January 2013 wrote a letter to the prosecutor stating that

> because of [his] heavy trial schedule, the number of cases in which [he] recently received discovery . . . [he is] in need of additional time to review the discovery to see if it is complete, prepare motions, and consider any suppression issues. Based on the above, I respectfully request ample time to review the materials.

The State did not need to request a continuance before January 2013 and for an "ample time" after because Defendant was also not ready to proceed to trial. At minimum, Defendant acquiesced in the delay at this point, but the State nonetheless failed to re-submit the samples to the lab until 2014 and the labs were not completed until 2015. While the State failed to have the DNA and blood tested for approximately three years due to the incomplete submission in 2012, combined with a backlog in the Lab, which can be attributed both to the prosecution and law enforcement's failure to initially send a "known standard" from Defendant and to the backlog in the Lab generally, Defendant acquiesced in part of this delay. But the prosecution and state crime lab are both responsible for processing evidence, and the State did not do so due to the incomplete submission of the DNA test request

combined with the Lab backlog, similar to the rationale for a backlog in the trial court, so this weighs "slightly, but firmly, . . . in the favor of [D]efendant." *Farmer*, 376 N.C. at 416, 852 S.E.2d at 342.

### 3. *Defendant's Change of Counsel and Plea Negotiations*

Next, Defendant asserts the trial court improperly considered his changes in trial counsel was a neutral factor when the changes did not cause any delay and that "[a]t most, the plea negotiations account for a few months of the six-year delay."

As to Defendant's change of counsel, Defendant challenges finding 106(c) and conclusion of law 10. Finding 106(c) states, Defendant "due to no fault of his own, had new counsel on three separate occasions, and was ultimately represented at trial by his fourth attorney." Conclusion of law 10 provides "Mr. Randolph, Mr. Davis, and Mr. Bingham were allowed to withdraw in this case by order of a Superior Court Judge. Withdraw of counsel is not weighed against [D]efendant or the State, the [c]ourt concludes they are neutral reasons for the delay." The State briefly addresses Defendant's "multiple changes in counsel" but does not address this part of Defendant's argument further, other than noting one of Defendant's counsel's date of withdrawal in the context of plea negotiations; still, in this section the State does not contend Defendant's change in counsel resulted in a delay. In Defendant's prior appeal, our Supreme Court stated "even if changes to [Defendant's] counsel prolonged the pendency of this case, it may be of no constitutional significance if those changes were warranted and necessary." *Farook*, 381 N.C. at 187, 871 S.E.2d at 752. Further,

our Supreme Court stated "[o]n remand, the trial court can evaluate what weight, if any, should be given to this fact in assigning responsibility for the delay in this case." *Id*. While Defendant takes issue with the trial court "fail[ing] to acknowledge . . . that the changes in counsel account for virtually none of the delay[,]" the trial court did not state how long of a delay the changes in counsel caused and, importantly, did not weigh the change in counsel against Defendant. We conclude Defendant's argument here is without merit as the trial court merely stated Defendant had multiple attorneys withdraw and did not weigh this against Defendant.

As to the plea negotiations, Defendant argues

> [t]he remand court understood that plea negotiations are a neutral reason for delay – that is, they do not weigh against either party. However, the remand court failed to appreciate that a neutral factor, having no weight, cannot overcome the weight of other factors. To the extent that plea negotiations in 2017 might excuse some portion of the delay, the majority of the delay remains attributable to the State of North Carolina.

Defendant challenges findings of fact 43, 47, 48, and 106. These findings state:

> 43. July 20, 2016, the Conference of District Attorneys received the discovery in [D]efendant's cases. There were some initial conversations between Sarah Garner and Mr. Davis and/or members of Mr. Davis['s] law office. Ms. Garner often corresponded with Candace, who was Mr. Davis's legal assistant. Mr. Davis was still heavily concentrating on Alisha Carlisle and Marlene Johnson cases along with many other matters.
>
> . . . .
>
> 47. Around January 2017[,] Ms. Garner began telephone

conversations about this case with [ ] ADA Poppler and Mr. Davis and/or Candace who was Mr. Davis['s] legal assistant. When speaking with Mr. Davis, Ms. Garner proceeded to give her thoughts on the case and a range of years that she was thinking as to an appropriate plea. Ms. Garner asked what Mr. Davis was thinking as a range of years. Ms. Garner testified there was a range offer somewhere between twenty to thirty years, nothing firm. This was just to see if there were (sic) room for further plea discussions. There was no indication that [D]efendant would not take a plea under any circumstances.

48. On March 10, 2017, Ms. Garner set a deadline for response on "range" of years for a plea offer. Ms. Garner did not usually involve the victims' family members in a discussion about a plea offer unless there was some indication that a plea may be acceptable to [D]efendant. No response from Mr. Davis during March 2017.

. . . .

106. The State presented evidence and reasons for the delay:

    d. That prior to the trial, the State and defense counsel engaged in substantial plea negotiations in an effort to find a resolution that was mutually agreeable to each party. Ms. Garner testified that at one point she and Mr. Davis were only about 10 months apart on the minimum sentence to be served. She further testified that she had given enough and would not go any lower.

While it is undisputed Ms. Garner made a formal plea offer to Defendant in April 2017, Defendant contends there were no "initial conversations" between Ms. Garner and Mr. Davis, and that Ms. Garner and Mr. Davis did not speak in January 2017 about a plea offer. The State merely responds that "[u]pon taking over the case, Resource Prosecutor Sarah Garner generally discussed plea figures with Defendant's

counsel" without citing to the record and makes a conclusory statement that "Defendant was engaged in plea discussions and negotiations throughout the case until 30 June 2017," again not citing to the record. In his reply brief, Defendant concedes ADA Poppler had a conversation with Mr. Davis about a potential plea in 2015 but states "[t]he conversation . . . was with Mr. Davis, not [Defendant]." First, we put no weight into the fact that plea negotiations were taking place between the State and Defendant's attorney as the State would not be negotiating with Defendant directly when he was represented by an attorney. Ms. Garner testified she initially met with Mr. Davis and his legal assistant when she first got the case but recognized "[d]uring that communication we talked about things, and we had an understanding essentially that we're waiting on information. There's not a whole lot to intelligently . . . talk about without missing pieces of the puzzle." Thus, Ms. Garner did engage in "initial conversations" about the case with Mr. Davis when she got the case, and finding 43 does not specifically state these conversations were plea negotiations; finding 43 is supported by the evidence as Ms. Garner testified she met with Mr. Davis and his legal assistant to discuss the case when she first received it in June 2016.

As to finding 47, Defendant notes the only supporting evidence that there were plea discussions in January 2017 is the prosecution's timeline which identifies "[i]nitial phone conversations with Sarah Garner" but as Defendant notes, this does not state who the conversations were with. And as Ms. Garner stated she was not in

a position to make a plea offer until she discussed it with the victims' families, which did not occur until March 2017, finding 47 is unsupported in that it states Ms. Garner and Mr. Davis were engaged in plea discussions. Finally, as to finding 48, the record does not support that "Ms. Garner set a deadline for response on 'range' of years for a plea offer" in March 2017 with Mr. Davis. In her testimony, after being asked about the 10 March conversation and whether there was a deadline, Ms. Garner stated "I do not recall what the deadline was. I know that there is a specific deadline on the written plea offer that I had sent Mr. Davis." This testimony indicates there was not a deadline for this unofficial discussion of the range of years in March 2017 and we will disregard that part of finding 48.

Overall, as to finding 106 and conclusion 9, the only evidence in the record as to plea negotiations are a brief period in 2015 with ADA Poppler and the time between the formal plea offer in April 2017 and Defendant's rejection of the offer in July 2017. In fact, Ms. Garner's testimony that she was unable to make a plea offer until speaking with the victims' families indicates there were not lengthy and ongoing plea discussions throughout the entire case as the trial court found. In *State v. Pippin*, this Court considered plea negotiations in the context of a speedy trial claim, stating:

> We hold that any time periods actually attributable to defense counsel's requested plea negotiations is a waiver by defendant of predicating a speedy trial claim on that period. Plea bargaining is a universal and necessary practice in the courts of this state. The practice is mutually beneficial to the state and defendants. Permitting defendants to avail themselves of this beneficial process

> and then to subsequently base speedy trial claims on delays expended in plea negotiations would be grossly prejudicial to the state. The trial court's order failed to determine this period of time, and we have been unable to determine this period from the motion transcript. The burden of proof for establishing any periods relating to plea bargaining was on the state. The state, having failed to adequately present the trial court with evidence as to the period expended in plea negotiations, cannot now complain as to the trial court's failure to exclude that time.

72 N.C. App. 387, 394, 324 S.E.2d 900, 905 (1985) (citation omitted). Similar to *Pippin*, the State here has not presented evidence to demonstrate exactly when and for how long plea discussions were taking place other than a brief period in 2015 and the time between the formal plea offer in April 2017 to the rejection in July 2017. *See id.* Nonetheless, the trial court gave this reason for delay neutral weight, which Defendant agrees with and is appropriate. However, as Defendant contends, this neutral reason for delay accounts for little of the overall delay. We will determine the effect of this neutral reason for delay as to the trial court's overall weight to the factor of the reason for delay in context of each reason given by the State.

### 4. *Defendant's Failure to Calendar the Case*

The final reason for delay listed by the remand court in finding 106 is that Defendant did not move to have the case calendared. Specifically, finding 106 e. and f. states:

> 106. The State presented evidence and reasons for the delay:
>
> . . . .

- 30 -

> e. Since [D]efendant's arrest on June 19, 2012, none of [D]efendant's various court appointed attorneys . . . asked for or filed any motion to calendar [D]efendant's cases for trial.
>
> f. The State never refused to calendar any motions or request from [D]efendant to set a trial date.

Defendant contends "[b]ecause the inaction of defense counsel did not lengthen the pretrial delay, this factor carries no weight in the *Barker* analysis." We agree with Defendant. It is well-established that the State is responsible for setting the calendar in a criminal case. *See* N.C. Gen. Stat. § 7A-49.4 (2023) ("(a) Criminal Docketing. – Criminal cases in superior court shall be calendared by the district attorney[.]"); *see also Farook*, 381 N.C. at 190, 871 S.E.2d at 754 ("In fact, the State has the calendaring authority to set a case for trial." (citation omitted)).

Both the State and the remand court cite *Vermont v. Brillon*, 556 U.S. 81, 92, 173 L. E. 2d 231, 241 (2009), to assert "[a]n assigned counsel's failure to move the case forward does not warrant attribution of delay to the State." While this is a correct statement of the law, *Vermont* was dealing with a case where the lower court concluded "a significant portion of the delay in bringing [the] defendant to trial must be attributed to the state, even though most of the delay was caused by the inability or unwillingness of assigned counsel to move the case forward" and each of the defendant's three court-appointed counsel requested "extensions and continuances." *Id*. *Vermont* also stated in this discussion that "[c]ontrary to the Vermont Supreme Court's analysis, assigned counsel generally are not state actors for purposes of a

speedy-trial claim." *Id.* Thus, the State and remand court's reliance on this case is inapposite as Defendant here is not asserting his counsel is a state actor, and more importantly, this case is distinguishable as there is a difference in Defendant or his counsel moving to continue the case or causing a delay in the calendar for another reason and the State failing to calendar the case at all.

While Defendant's actions in asserting his speedy trial rights are clearly relevant in the analysis of factor 3, Defendant's assertion of the right, the remand court weighed this in its discussion on the State's reasons for delay. As the State itself is responsible for calendaring a case for trial, the State's failure to calendar the case cannot be weighed against Defendant as a reason for the delay.

### 5. *Conclusion as to the Reason for Delay Factor*

Overall, we conclude the trial court should have weighed this factor slightly in favor of Defendant as the State is responsible for the backlog in the courts and the state crime lab, but as this case does not reach the level of neglect or willful delay as the *Washington* case, *see Washington*, 192 N.C. App. at 284, 665 S.E.2d at 804, we do not weigh this factor heavily in favor of Defendant. Similarly, no weight should be given to Defendant's failure to calendar the case as that is the duty of the State. Finally, the trial court did not err in weighing Defendant's change of counsel and plea negotiations as neutral delays. While some findings of fact made by the trial court are not supported by the evidence, there are sufficient findings to show the State presented valid justifications for the reasons for delay in this case and this factor

should weigh "slightly, but firmly, . . . in the favor of [D]efendant." *Farmer*, 376 N.C. at 416, 852 S.E.2d at 342. Finally, we note that although Defendant generally challenges findings of fact 110 and 117 in his introduction, Defendant makes no arguments as to these challenges and they are deemed abandoned. *See* N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned.").

**C. Defendant's Assertion of his Right to a Speedy Trial**

Defendant argues the third factor, Defendant's assertion of the right to a speedy trial, should weigh in his favor despite not filing a speedy trial motion until 2018 since: (1) he attempted to alert the courts "to his prolonged detention beginning in 2013 and several times during the years that followed[;]" (2) "under the unique circumstances of this case, [Defendant's] trial counsel's failure to take action on his client's behalf cannot be imputed to [Defendant;]" and (3) "the State was independently aware that the backlog in the Rowan County courts and at the State Crime Laboratory had the potential to infringe on [D]efendants' constitutional rights." Defendant specifically challenges finding 88, which states "Defendant's failure to state or file his Demand for a Speedy Trial for a period of six years weighs against his claim."

> A defendant is not required to assert his right to a speedy trial in order to make a speedy trial claim on appeal. But a defendant's failure to assert his speedy trial right, or his failure to assert the right sooner in the process, does weigh against his contention that he has been denied his

constitutional right to a speedy trial.

*State v. Johnson*, 251 N.C. App. 260, 268-69, 795 S.E.2d 126, 132-33 (2016) (citations and quotation marks omitted).

### 1. *Defendant's Letter to the Trial Judge and Federal Court Actions*

It is undisputed that Defendant's first speedy trial motion did not occur until September 2018; the trial court found Defendant filed a *pro se* motion to dismiss for a speedy trial violation on 13 September 2018 and his counsel filed a speedy trial motion on 18 September 2018. Both motions were filed over 6 years after Defendant was arrested and less than one month before the date of trial. Typically, "[t]he eleventh-hour nature of Defendant's speedy trial motion [would] carr[y] minimal weight in his favor." *Id.* at 269, 795 S.E.2d at 133.

However, Defendant sent a letter to Senior Resident Superior Court Judge Anna Mills Wagoner on 12 July 2013 seeking discovery for his case and explaining he had been in pre-trial confinement for over a year. In response, the trial court sent a letter to Defendant, which was also sent to the District Attorney, informing Defendant that the trial court cannot speak with him about his case since he "ha[s] an attorney and cannot both be represented by [him]self and an attorney at the same time." In January 2016, Defendant sent a letter to United States District Court Judge Loretta Biggs claiming his due process rights have been violated as he has been in the Rowan County Jail for 43 months "without enough evidence[.]" Defendant stated his bail was too high for the charges and that "[f]or some unknown reason the . . .

District Attorney is letting pretrial detain[e]e s[i]t in jail [for] 3, 4, 5 years." Finally, Defendant contended he was discriminated against due to his race during his arrest. The letter does not explicitly invoke the Sixth Amendment right to a speedy trial, but as stated above, discusses the amount of time he has been in jail without a trial or plea bargain. The federal court treated this letter as a habeas petition and dismissed it on 2 March 2016.

Defendant also filed a separate federal action in February 2016 under 28 United States Code Section 2241 alleging his due process rights have been violated as he has been in detention for 43 months and the State does not have enough evidence to prosecute the case. He asserted he was being discriminated against and he had an excessive bond. This action was similarly dismissed on 19 April 2016. In August 2017, Defendant sent another letter to Judge Biggs in the United States District Court, stating he had now been incarcerated for 57 months in violation of the Fifth, Eighth, and Fourteenth Amendments and that this was a "vindictive prosecution" and "prosecutorial misconduct[.]" Again, Defendant did not specifically raise a speedy trial motion under the Sixth Amendment in this letter. The federal court again dismissed this complaint. Each United States District Court judgment was served on the Rowan County District Attorney. Finally, on 17 March 2018, Defendant sent another letter to the Rowan County Clerk of Court inquiring into the delay of his trial. This was file-stamped by the clerk who responded "[t]here are no written motions in any of your files."

The State does not address Defendant's letter to Rowan County Judge Wagoner but contends the filing of the federal actions (1) does not demand a speedy trial but instead contends there is insufficient evidence, among other due process violations and (2) the federal complaints cannot be used to show he asserted his right to a speedy trial since "a [c]ourt cannot take any action on matters of which it has no knowledge, and that a party never raises before it."

This Court has previously determined such "informal" assertions of a speedy trial claim can be considered by the court in its analysis of this factor. *See Washington*, 192 N.C. App. at 291, 665 S.E.2d at 808 ("Thus, while [the] defendant's formal assertion of his right was not immediate, he did assert this right almost two years prior to the start of his trial. Further, [the] defendant began informally asserting his right as early as October of 2002, when he began moving the court to expedite SBI testing. The [d]efendant continued to complain about the delay throughout his prosecution. Accordingly, when considered together, these actions weigh in favor of [the] defendant."); *see also State v. Armistead*, 256 N.C. App. 233, 240, 807 S.E.2d 664, 670 (2017) ("We conclude that [the d]efendant's attempts to assert his speedy trial right through informal methods—absent any evidence that his assertions reached the proper court officials or the prosecutor until three years after [the d]efendant first failed to appear in court—are neutral to our determination.").

The 2013 letter sent to Judge Wagoner was file-stamped, copied to the District Attorney, and put into Defendant's court file. This letter did not specifically assert

Defendant wanted a speedy trial but did complain of the time he spent in the county jail, though his arguments centered on the lack of evidence and other due process concerns. However, Defendant's formal assertion of his right to a speedy trial was not raised until 2018, weeks before trial. This is in contrast to *Washington*, where the defendant's formal assertion was "one year and eight months before his trial began[;]" this Court weighed this factor in favor of the defendant. *Washington*, 192 N.C. App. at 290-91, 665 S.E.2d at 808. In *Armistead*, the defendant did not formally assert his right to a speedy trial at all but sent letters to court officials asserting such a right; however, in that case there was no evidence the informal methods ever reached court officials as some of the letters were not in the defendant's court file. *See Armistead*, 256 N.C. App. at 240, 807 S.E.2d at 670. This Court determined this factor was neutral in the analysis. *See id.*

Here, Defendant's 2013 letter did reach court officials and it was put in Defendant's file. Still, as noted above, this letter raised various other due process issues and did not specifically demand a speedy trial. Defendant did mention how long he spent in jail in this letter, but he did not demand a speedy trial. Defendant was represented by counsel during the years prior to his formal assertion in September 2018, but never explicitly raised a speedy trial issue.[2] The same can be

---

[2] We recognize Defendant claims he received "lack of meaningful" assistance from counsel during this time period, but we nonetheless note Defendant was not a *pro se* defendant during most of the time he was incarcerated.

said for Defendant's federal filings, which were served upon the Rowan County District Attorney. Defendant did not specifically raise a speedy trial claim or demand a trial, he raised other due process issues and sufficiency of the evidence against him. The State's argument that it did not know about the federal filings is unconvincing as they were served upon the District Attorney. Thus, as Defendant did inform the court about the significant time he was in jail pending trial, which can be deemed informal assertions of his right to a speedy trial, he failed to specifically raise a speedy trial claim until September 2018 when he filed his formal motion.

### 2. *Lack of Meaningful Assistance from Counsel*

In his discussion of the third *Barker* factor, Defendant also claims he received a "lack of meaningful assistance from counsel" during the pendency of the case and his attorney's failure to inform him of his speedy trial rights should not be imputed on him. Central to Defendant's claim of lack of meaningful assistance from counsel is the assertion he "did not meet with any attorney appointed to his case until 2017." The State disputes this claim and states "[a]ny implication or allegation that Defendant had no conversations or discussions with his attorneys prior to 2017 is contradicted by his own admission in his own exhibits in the record, and is therefore not credible."

The State argues Defendant is trying to argue ineffective assistance of counsel without actually raising an ineffective assistance of counsel claim; Defendant responds that

> [t]he State fails to respond to any of the cases cited [in Defendant's opening brief]. Instead, the State accuses counsel of attempting to raise a claim of ineffective assistance of counsel on direct appeal. Counsel refers the State to page 38 of the Opening Brief, which plainly states that issue is not before this Court.

However, none of the cases cited by Defendant in his opening brief involve speedy trial claims. *See Holland v. Florida*, 560 U.S. 631, 177 L. Ed. 2d 130 (2010); *see also Maples v. Thomas*, 565 U.S. 266, 181 L. Ed. 2d 807 (2012); *Christeson v. Roper*, 574 U.S. 373, 190 L. Ed. 2d 763 (2015). Defendant seemingly argues, as the State contends, that he should not be penalized for his failure to submit a formal speedy trial demand before September 2018 due to his counsel's actions but that he did not receive ineffective assistance of counsel. If Defendant claims that the delay in his trial was a result of ineffective assistance of counsel, he should have argued that, but he did not.

Defendant mostly relies on *Holland v. Florida* to assert "[w]hile the actions of counsel are ordinarily imputed to his client, there are circumstances where this is not so." 560 U.S. 631, 177 L. Ed. 2d 130. In *Holland*, the defendant's attorney "failed to file [the defendant's habeas corpus] petition on time and appears to have been unaware of the date on which the limitations period expired[.]" *Id.* at 652, 177 L. Ed. 2d at 147. The Court stated these "two facts . . . alone, might suggest simple negligence" but then identified the other extraordinary facts of the case:

> But, in these circumstances, the record facts we have elucidated suggest that the failure amounted to more:

> Here, [the attorney] failed to file [the defendant's] federal petition on time despite [the defendant's] many letters that repeatedly emphasized the importance of his doing so. [The attorney] apparently did not do the research necessary to find out the proper filing date, despite [the defendant's] letters that went so far as to identify the applicable legal rules. [The attorney] failed to inform [the defendant] in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite [the defendant's] many pleas for that information. And [the attorney] failed to communicate with his client over a period of years, despite various pleas from [the defendant] that [the attorney] respond to his letters.

*Id*. at 652, 177 L. Ed. 2d at 147-48.

One of the key factors the Court noted in *Holland* is the defendant's "many letters that repeatedly emphasized the importance of" filing the petition. *Id*. If Defendant had informed his attorney multiple times of his desire to assert a speedy trial claim, this case would be more analogous to *Holland*. *See id*. However, despite Defendant's ability to write letters, including letters specifically relating to the amount of time he spent in jail, there is nothing in the record to suggest Defendant informed his attorney of his desire to demand a speedy trial. In fact, Defendant did not send his attorney a copy of the 2013 letter to Judge Wagoner, although Judge Wagoner's response was copied to Defendant's attorney. Similarly, the letters and actions submitted to the federal court by Defendant do not show that any of these items were copied to Defendant's attorney; while the judgments were seemingly served on the District Attorney, a party to the action, they were not served on Defendant's attorney. And based on the record before this Court we are unable to say

if this delay was a trial tactic or if Defendant's attorney was negligent in his representation. Defendant's attorney's motive for delay was a major issue in Defendant's prior appeal, where our Supreme Court concluded the trial court improperly heard testimony about the delay from Defendant's attorney in violation of the attorney-client privilege. *See Farook*, 381 N.C. at 188-89, 871 S.E.2d at 753. Even assuming *Holland* is relevant in our analysis of this speedy trial claim, despite interpreting a federal habeas statute and not the constitutional right to a speedy trial, *Holland*, 560 U.S. at 652, 177 L. Ed. 2d at 142, the facts of that case are much more egregious than this case, and as Defendant does not raise an ineffective assistance of counsel claim, we find no merit in this argument.

### 3. *Conclusion as to Defendant's Assertion of his Speedy Trial Rights*

As Defendant made multiple informal assertions regarding his speedy trial rights and these informal assertions were served on the State, we conclude his failure to submit a formal demand for speedy trial until September 2018 should not weigh against him. But since Defendant's formal assertion was not made until shortly before his trial date, we give this factor neutral weight instead of being weighed against Defendant.

## D. Prejudice to Defendant

As to the final *Barker* factor, prejudice to Defendant, Defendant asserts "[t]he remand court erred in failing to give any weight to [Defendant's] pretrial incarceration, the anxiety [Defendant] suffered as years passed with no progress in

his case, or the prejudice inherent in an extraordinary pretrial delay followed by the imposition of new charges."

Defendant challenges findings of fact 63 and 93. Findings 63 and 93 state:

> 63. ADA Poppler and Ms. Garner made it clear early on (in their involvement in the case) that if [D]efendant rejected the plea offer there would be new indictments. This particular issue relating to the potential for new charges was discussed even before ADA Banks left the Rowan County District Attorney's Office.
>
> . . . .
>
> 93. The State filed new charges in 2017. These charges are from the same set of facts and underlying allegations and criminal record that existed on the date of [D]efendant's arrest (June 19, 2012). There is no prejudice, actual or presumptive.

As to finding 63, Defendant contends "[t]his record does not establish that the defense was aware 'early on' that there was a potential for additional indictments." ADA Poppler testified he inherited the case in May 2013 and when asked whether he had "any conversations with [Defendant's counsel] about possible alternate charges as an inducement to a plea agreement[,]" ADA Poppler responded:

> When I met with Mr. Davis or when I spoke to him on one of the occasions about this case, I made it clear to him as I did on every case, if I'm trying a case, I'm going after what I can go after to try it. Specifically, Habitual Felon we knew was certainly in play here. I believe we spoke about Violent Habitual Felon. Mr. Davis was aware of that either through Mr. Banks or myself as appearing to be something [Defendant] was eligible for.

ADA Poppler also addressed this in response to questioning about the indictments:

> Q. Okay. So if the record were to indicate that he was not indicted for either Second Degree Murder, Habitual Felon or Violent Habitual Felon until 2017, you wouldn't disagree with that?
>
> A. I would agree with whatever the indictments say that are in the court file.
>
> Q. Okay. So that would mean that at the time that you had the cases the charges were E and F felonies?
>
> A. If that's correct what you're saying, then yes. *However, as I stated earlier, in speaking with Mr. Davis, he was well aware and I made him aware that those charges were potentially out there.*

(Emphasis added.) Ms. Garner also testified as to her decision-making in deciding which charges to pursue:

> Q. At the time that you're making your charging decision about the substantive offense, are you going to definitively decide whether you might also proceed on a status offense like Violent Habitual Felon or Habitual Felon?
>
> A. My process has always been it's out there if you need it. I wouldn't say you use it as a threat, but it is certainly something that I would always say to defense attorneys, this is an option. If you want to try, you're getting a full trial, a lot like Mr. Poppler said.
>
> Q. I mean, would you consider making a concession for a plea agreement that you might not charge something that you could charge?
>
> A. Absolutely, which is exactly what I did.

Therefore, the testimony from the State's prosecutors suggests Defendant or his attorneys knew early on in the case there may be more indictments coming and that if Defendant did not plead to some of the crimes they would proceed with a trial

on all of the charges. Defendant's challenge to finding 63 is overruled.

As to Defendant's challenge to finding 93, it is essentially a challenge to whether Defendant was prejudiced as a result of the delay from the 2017 indictments. In Defendant's prior appeal, our Supreme Court stated:

> *Barker* and its progeny make clear that one of the purposes of the speedy trial guarantee is to protect against those forms of prejudice that are so axiomatic as to require no affirmative proof. *Doggett*, 505 U.S. at 655, 112 S.Ct. 2686. The failure to show actual prejudice to the defense is not fatal per se to a speedy trial claim. Thus, "presumptive prejudice" along with the fact that the other factors are found to tip the scales in a defendant's favor may be enough to require dismissal of the charges, especially when there is no justification presented by the government. *See id.* (declaring the defendant had done enough to secure dismissal on speedy trial grounds, recognizing that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify"). And as the Court clarifies in *Doggett*, a criminal defendant may establish prejudice for purposes of his speedy trial claim through proof of either actual prejudice or presumptive prejudice.

*Farook*, 381 N.C. at 190, 871 S.E.2d at 753-54 (quotation marks omitted). Our Supreme Court relied almost exclusively on the United States Supreme Court opinion in *Doggett v. U.S.*, 505 U.S. 647, 120 L. Ed. 2d 520 (1992), in its discussion of prejudice. In *Doggett*, the delay of eight-and-a-half years was between the defendant's indictment and his arrest. *Id.* at 650, 120 L. Ed. 2d at 527. The Supreme Court stated, as to prejudice, "[w]hile not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically

tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." *Id*. at 657, 120 L. Ed. 2d at 531.

In *Farmer*, our Supreme Court stated, as to the prejudice factor:

> In examining the most serious component of the prejudice factor which was identified by our country's preeminent legal forum in *Barker*—the possibility that the defense will be impaired—this prospect did not manifest itself in the present case. There has been no contention by [the] defendant that the presentation of his trial defense was impaired, nor any representation by [the] defendant regarding such a compromise of his trial defense. Therefore, the most significant of the three prongs of the prejudice factor does not exist in this case. The first identified prong—the prevention of oppressive pretrial incarceration—inherently exists by virtue of the longevity of [the] defendant's continuous confinement prior to his trial. The remaining feature of the prejudice components— the minimization of [the] defendant's anxiety and concern—would also inherently exist as he awaited the occurrence of his trial which would resolve the charges against him. While we do not disregard nor diminish the deleterious effects of [the] defendant's prolonged pretrial incarceration, as well as anxiety and concern, upon an accused such as [the] defendant who is awaiting trial for an appreciable period of time, we nonetheless are bound to follow the *Barker* formula on prejudice in recognizing that there was no impairment of [the] defendant's defense which was occasioned by the delay of the trial and the standard presence of the remaining two interests did not rise to a level which amounted to any prejudice to [the] defendant's rights.
>
> In assessing the identified interests which compose the prejudice factor established in *Barker*, we agree with the Court of Appeals majority that [the] defendant did not suffer prejudice in this case stemming from the delay of his trial. While the dissenting view of the Court of Appeals deems this fourth *Barker* factor to weigh slightly in favor

of [the] defendant without a demonstration of actual prejudice experienced by [the] defendant, we determine that this final *Barker* factor of prejudice to [the] defendant as a result of the trial's delay significantly weighs against [the] defendant.

*Farmer*, 376 N.C. at 418-19, 852 S.E.2d at 343.

While our Supreme Court in Defendant's prior appeal stated there was presumptive prejudice due to the lengthy delay in this case, we agree with the Court's opinion in *Farmer*, which does not contradict the Court's reasoning in Defendant's prior appeal. *See id.*; *see also Farook*, 381 N.C. at 190, 871 S.E.2d at 753-54. Like *Farmer*, we recognize the presumptive prejudice due to Defendant's time spent incarcerated and the anxiety caused by that time, but there is simply no indication Defendant's defense was hampered in any way by this delay. *See Farmer*, 376 N.C. at 418-19, 852 S.E.2d at 343. As Defendant or his attorneys knew the State may proceed with additional indictments for the same acts as he was initially charged, he cannot now claim he was prejudiced in his defense as the new indictments were from the same underlying facts and the new indictments would not create a need for any new witnesses or evidence. Defendant does not even attempt to articulate what additional evidence, witnesses, or otherwise would have supported his defense had he known about the additional indictments; instead, Defendant relies on presumptive prejudice. This is analogous to our Supreme Court's decision in *Farmer*, where the Court stated "there has been no contention by [the] defendant that the presentation of his trial defense was impaired, nor any representation by [the] defendant regarding

such a compromise of his trial defense. Therefore, the most significant of the three prongs of the prejudice factor does not exist in this case." *Id*. at 418, 852 S.E.2d at 343.

Finally, Defendant claims that even if his attorneys were aware of the potential for new charges to be filed, "there is no basis to find that any earlier discussions [regarding the filing of new charges] were communicated to" Defendant and "[i]t is impossible to know how the case might have progressed differently had [Defendant] been aware from the start that he faced the possibility of a life sentence." However, Defendant argues in a different section of his brief that he is not contending he received ineffective assistance of counsel and he even challenges certain findings addressing such a claim. Further, the State cannot be responsible for Defendant's attorneys' potential failure in communicating the possibility of new charges to Defendant since that is out of the State's control and attempting to contact Defendant directly would not have been proper. *See* U.S. Const. amend. VI. We are unconvinced that Defendant was prejudiced because the State filed additional charges against him.

In *Farmer*, after the Court acknowledged the presumption of prejudice created by the length of the delay, it nonetheless "determine[d] that the presumption of prejudice in [the] defendant's case due to the length of the delay has been sufficiently rebutted by the collective effect of the other *Barker* factors." *Id*. at 419, 852 S.E.2d at 344. We see no reason to depart from *Farmer* and likewise conclude the prejudice

prong weighs against Defendant as the State presented substantial evidence as to the backlog in the court.

## E. Miscellaneous Challenged Findings

Finally, Defendant challenges findings of fact 17, 71, 44, and 115 in a separate section of his brief entitled "Additional Contested Findings of Fact[.]" These contested findings state:

> 17. When ADA Poppler received the case, it was not ready for trial as he was awaiting lab results. ADA Poppler and Mr. Davis or members of his law firm had numerous conversations early on about [D]efendant's case. . . .
>
> . . . .
>
> 44. Mr. Davis tried approximately 18 jury trials in Rowan County Criminal Superior Court between 2013 and 2017. Mr. Davis has a very busy criminal and civil practice in Rowan County. Mr. Davis in addition to the Carlisle murder case represented other defendants charged with first degree murder during this time. One of those cases was Marlene Johnson. Mr. Davis had a substantial case load and many scheduling conflicts from 2012 to 2018.
>
> . . . .
>
> 71. September 10, 2017, [D]efendant submitted a pro se document alleging ineffective assistance of counsel as to Mr. Davis. Defendant is at this time still represented by Mr. Bingham.
>
> . . . .
>
> 115. The lengthy plea discussions could in theory be weighed against the defendant as acquiescence of the delay. The [c]ourt does consider the length of time in which the defendant went without seeing or speaking directly with his court appointed counsel Mr. Davis. The [c]ourt

does not weigh the lengthy plea negotiations against the defendant. This particular issue is more appropriately dealt with in any ineffective assistance of counsel claim. There was some evidence that Mr. Davis sent individuals from his office to speak to the defendant but there was no evidence as to what was communicated to the defendant. Defendant presented jail records indicating Mr. Davis did not visit him for 57 months.

As to finding 17, Defendant contends the finding should be modified to say "[w]hen ADA Poppler received the case, he did not believe [the case] was ready for trial" instead of "[w]hen ADA Poppler received the case, it was not ready for trial as he was awaiting lab results." But this finding is supported by the evidence. If the State needed the DNA results to prove its case, the case was not ready for trial. Next, Defendant contends "the finding that Mr. Poppler had 'numerous' conversations with Mr. Davis shortly after his appointment is not supported by the record" since he "testified to a single conversation." We agree with Defendant that the record supports a conversation happened, but not numerous conversations. We will disregard the part of finding 17 that states ADA Poppler had "numerous" conversations with Mr. Davis.

Defendant contends finding 71 is not supported as there was no *pro se* document filed by Defendant on 10 September 2017. Our record contains a *pro se* document filed by Defendant on 11 September 2017 entitled "Motion to Dismiss Appointed Attorney[.]" (Capitalization altered.) The document is hard to read in our record, but this may have been the document referred to by the trial court in finding

71. The trial court's finding is supported by the evidence, and if finding 71 stated the wrong date, the difference of one day in the date filed is *de minimis*.

As to findings 44 and 115, Defendant does not really challenge the findings, instead stating he "wishes to emphasize that the fact he may also have received ineffective assistance does not absolve the State of its duty to provide him with a speedy trial." Finding 44 does not mention ineffective assistance of counsel but merely outlines Mr. Davis's heavy caseload during his representation of Defendant. Since Defendant does not challenge the substance of finding 44, it is supported by the evidence. *See In re S.C.L.R.*, 378 N.C. 484, 491, 861 S.E.2d 834, 841 (2021) ("As findings not challenged for their lack of evidentiary support are deemed to be supported by the evidence and are binding on appeal and because respondent-mother has not challenged the evidentiary basis for any of the findings of fact, we must consider all findings of fact binding on appeal as to respondent-mother." (citation omitted)). Finding 115 does mention the possibility that Defendant may have received ineffective assistance of counsel but it does not absolve the State of its duty to provide Defendant with a speedy trial. This challenge is overruled.

## F. Conclusion

While the first factor in the *Barker* analysis – length of the delay – shows presumptive prejudice, the State rebutted this presumption with its extensive evidence as to the reasons for the delay, specifically the backlog of the court system in Rowan County during Defendant's trial. Further, the third factor – the assertion

of right – has neutral weight as Defendant attempted to alert the State to his incarceration by mailing a letter to the trial judge and filing a federal action, but nevertheless did not submit a formal motion until September 2018, weeks before his trial date. And as in *Farmer*,

> [a]s we follow the guidance articulated by the Supreme Court of the United States, since the length of the delay was "presumptively prejudicial" which necessitated the inquiry into the other *Barker* factors and since "they are related factors and must be considered together with such other circumstances as may be relevant," we determine that the presumption of prejudice in [D]efendant's case due to the length of the delay has been sufficiently rebutted by the collective effect of the other *Barker* factors.

*Farmer*, 376 N.C. at 419-20, 852 S.E.2d at 344 (citation omitted). We affirm the trial court's order denying Defendant's motion to dismiss on speedy trial grounds.

## III. Sufficiency of the Evidence

Defendant next contends "where the only evidence to support a finding of malice was that Defendant was driving while license revoked at the time of the accident and that he inadvertently crossed the center line, the trial court erred in denying the motion to dismiss the charges of second-degree murder."

## A. Standard of Review

> In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator. Substantial evidence is the amount necessary to persuade a rational juror to accept a conclusion. In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be

considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. In other words, if the record developed at trial contains substantial evidence, whether direct or circumstantial, or a combination, to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied. Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo.

*State v. Golder*, 374 N.C. 238, 249-50, 839 S.E.2d 782, 790 (2020) (citations, quotation marks, ellipses, and brackets omitted).

## B. Malice

As Defendant only challenges the element of malice, our review will be limited to that element. "The essential elements of second degree murder are an unlawful killing of a human being with malice, but without premeditation and deliberation." *State v. Trogdon*, 216 N.C. App. 15, 25, 715 S.E.2d 635, 642 (2011) (citation omitted). Our Courts have identified three different types of malice for purposes of second-degree murder:

First, there is actual malice, meaning express hatred, ill-will or spite. The second type of malice exists when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief. The third type of malice is a condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification.

*Id*. (citations and quotation marks omitted). As Defendant did not know the victims in this case and it is undisputed Defendant did not intentionally kill them, the second type of malice is the only type at issue here. Our Supreme Court has also stated, in a case involving vehicular second-degree murder, "it was necessary for the State to prove only that [the] defendant had the intent to perform the act of driving in such a reckless manner as reflects knowledge that injury or death would likely result, thus evidencing depravity of mind." *State v. Rich*, 351 N.C. 386, 395, 527 S.E.2d 299, 304 (2000).

The State cites *State v. Byers*, 105 N.C. App. 377, 413 S.E.2d 586 (1992), to contend "where a defendant drove a car knowing that his license was permanently revoked, such act indicated that the defendant acted with a mind without regard for social duty and with 'recklessness of consequences.'" This Court stated in *Byers*, "[w]e find the evidence presented at trial tending to show [the] defendant knew his license was revoked and proceeded to drive regardless of this knowledge indicates [the] defendant acted with 'a mind regardless of social duty' and with 'recklessness of consequences.'" *Id*. at 382, 413 S.E.2d at 589. However, this Court also recognized other facts that indicated malice, such as the defendant taking "the car without permission and display[ing] fictitious tags in order to drive indicates a mind 'bent on mischief.'" *Id*.

Here, the State relied on Defendant's license being revoked at the time of the crash, Defendant driving left of center, and Defendant slurring his words and

smelling of alcohol upon his arrest as evidence of malice. We also note Defendant fled the scene of the crash after getting out of the car to check on the victims but failed to render any aid and then lied to investigating officers about his identity to avoid responsibility. However, as the State did not present sufficient evidence that Defendant was impaired by alcohol or drugs at the time of the crash, driving under the influence cannot be a basis for malice in this case. Many of our cases rely on the defendant being impaired at the time of a crash to find malice. *See State v. Bethea*, 167 N.C. App. 215, 219, 605 S.E.2d 173, 177 (2004) ("[The d]efendant correctly points out that every North Carolina appellate decision involving an automobile accident, where the court found sufficient evidence to prove malice for a second-degree murder conviction, involved a defendant driving under the influence of alcohol or some other impairing substance at the time of the accident."). In *Bethea*, the

> defendant was driving with a revoked license, fled to elude law enforcement officers, sped through a red light and several stop signs, drove at speeds up to one hundred miles per hour, crossed into the oncoming traffic lane several times, and turned his car lights off on dark rural roads, decreasing his own visibility and making his car extremely difficult to see, while traveling at speeds between ninety and ninety-five miles per hour.

*Id.* While *Bethea* itself was one of the first North Carolina cases to rely on acts other than driving while impaired to show malice, the facts in that case were egregious and clearly showed malice. *See id.*

Another case where this Court held there was sufficient evidence to support a

finding of malice noted as relevant in its analysis that the defendant "fled the scene of the crash without checking on either the occupants of the truck or his friends inside the severely damaged car[.]" *State v. Tellez,* 200 N.C. App. 517, 525, 684 S.E.2d 733, 739 (2009). The defendant also "hid and slept in the woods and ran from police when apprehended." *Id.* While other factors supported a finding of malice, such as the defendant having 3 beers before driving, drinking another beer while driving, failing to stop at a stop sign, and "pull[ing] onto Highway 210 without noticing the truck" he collided with, this case is analogous to the instant case. *Id.*

Here, a witness who observed the crash saw Defendant get out of his car and walk up to the victims' bodies. The witness testified that Ms. Jones was still breathing by the time the witness got close to her body. However, instead of alerting emergency services or rendering aid, Defendant fled the scene of the crash. When Deputy Goodman approached Defendant after the crash asking if he knew Donald Miller, which was Defendant's name before he changed it to Khalil Farook, Defendant stated he did not. Finally, Defendant's driver's license was revoked at the time of the crash due to an impaired driving revocation. These actions by Defendant are all indicative of malice. *See id.*

While this case is not as clear as the cases involving driving while impaired, fleeing law enforcement, or driving at high rates of speed, we are bound by our precedent that driving with a revoked license due to an impaired driving revocation "indicates [D]efendant acted with 'a mind regardless of social duty' and with

'recklessness of consequences.'" *Byers*, 105 N.C. App. at 382, 413 S.E.2d at 589. Similarly, briefly exiting his car to check on the victims but failing to render aid or report the crash in any way and thereafter fleeing the scene of the crash "indicates a mind 'bent on mischief.'" *Id.* Under the facts of this case, we conclude there was substantial evidence of the element of malice and the trial court did not err by denying Defendant's motion to dismiss.

## IV.   *Harbison* **Error**

Finally, Defendant argues "where . . . Defendant did not give his express, informed consent, trial counsel rendered ineffective assistance by conceding his guilt to lesser included offenses during closing argument."

"We review *per se* ineffective assistance of counsel claims *de novo*." *State v. Mahatha*, 289 N.C. App. 52, 60, 887 S.E.2d 462, 469 (2023) (citations and quotation marks omitted). It is well-established that to prevail on an ineffective assistance of counsel claim,

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*State v. Harbison*, 315 N.C. 175, 178-79, 337 S.E.2d 504, 506 (1985) (citation omitted).

In *Harbison*, our Supreme Court first articulated the rule that a "per se . . . violation

of the Sixth Amendment[ ] has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent." *Id.* at 180, 337 S.E.2d at 507-08.

> Where defense counsel's statements to the jury cannot logically be interpreted as anything other than an implied concession of guilt to a charged offense, *Harbison* error exists unless the defendant has previously consented to such a trial strategy. The trial court must be satisfied that, prior to any admissions of guilt at trial by a defendant's counsel, the defendant must have given knowing and informed consent, and the defendant must be aware of the potential consequences of his decision.

*Mahatha*, 289 N.C. App. at 61, 887 S.E.2d at 470. Thus, we must first address whether Defendant's counsel made a concession of guilt, and if so we must consider whether Defendant consented to the concession. *See id.*

Here, as Defendant notes, and we agree, Defendant's trial counsel conceded guilt during closing arguments when counsel stated "we ask you to find [Defendant] guilty of misdemeanor death by motor vehicle" and "we're not, as a defense, not asking you to find him not guilty of anything. We're asking you to find the most appropriate, which is the lesser included . . . misdemeanor offenses of both of these crimes." In *State v. Greene*, our Supreme Court was confronted with the question of whether an attorney arguing during closing arguments that "in his opinion the jury would not find the defendant not guilty and that it could easily find that the 'slap was negligent,' 'harder than it ought to have been,' and 'it was reckless disregard.'" 332 N.C. 565, 571-72, 422 S.E.2d 730, 733 (1992). However, the defendant's counsel further stated,

"I don't say you should find that." *Id*. at 572, 422 S.E.2d at 733. Our Supreme Court

concluded

> [w]e believe the argument was that the defendant was innocent of all charges but if he were to be found guilty of any of the charges it should be involuntary manslaughter because the evidence came closer to proving that crime than any of the other crimes charged. This is not the equivalent of asking the jury to find the defendant guilty of involuntary manslaughter and the rule of *Harbison* does not apply.

*Id*. at 572, 422 S.E.2d at 733-34.

Therefore, while counsel is permitted to make an argument that if the jury

should convict the defendant on any charge, it should be the lesser included charge,

*see id*., this was not the case here. Counsel first stated "[w]e're not here to ask you to

find [Defendant] not guilty." Then, at the end of his closing, counsel stated "the most

appropriate thing that you will convict - - that you *could* convict him of - - we ask you

to find him guilty of misdemeanor death by motor vehicle." (Emphasis added.) But

later, counsel unequivocally stated "we're not, as a defense, not asking you to find

him not guilty of anything. We're asking you to find the most appropriate, which is

the lesser included in misdemeanor offenses of both crimes." Thus, unlike in *Greene*

where "[t]he clear and unequivocal argument was that the defendant was innocent of

all charges[,]" *id*. at 572, 422 S.E.2d at 734, here, Defendant's counsel stated several

times he was not asking the jury to find Defendant not guilty. Thus, we agree with

Defendant that his counsel admitted Defendant's guilt to the lesser-included offenses.

We first briefly address the State's argument that "since *Harbison*, the North Carolina Supreme Court has recently revisited the issue of *per se* prejudicial error[,]" citing *State v. Malachi*, 371 N.C. 719, 821 S.E.2d 407 (2018). The State then engages in a significant discussion about the facts in *Malachi*, recognizes this Court is bound by our precedent in *Harbison*, yet asks us to "assess whether or not the *per se* prejudice analysis remains applicable to this type of error[,]" and if it is not still applicable, explains there is no prejudice in this case. As *Malachi* does not in any way depart from our Supreme Court's ruling in *Harbison*, *see generally id.*, we are bound by our Supreme Court's precedent and decline to revisit this issue. *See State v. Jones*, 253 N.C. App. 789, 796, 802 S.E.2d 518, 523 (2017) ("[T]his Court has no authority to reverse existing Supreme Court precedent. It is elementary that we are bound by the rulings of our Supreme Court." (citations, quotation marks, and brackets omitted)). Thus, we are bound by *Harbison* and will only address Defendant's consent, or lack thereof, to his counsel's concessions of guilt. *See id.*

As to Defendant's consent, the trial court conducted a *Harbison* hearing on 24 September 2018. At the hearing, Defendant's counsel stated the defense was "willing to concede certain elements" including that Defendant was driving the car at the time of the collision. The trial court then engaged in a brief colloquy with Defendant:

> THE COURT: And you're . . . you're not asking for the State to have to prove that beyond a reasonable doubt; is that correct?
>
> THE DEFENDANT: Yes, ma'am.

> THE COURT: Okay. All right.
>
> [DEFENDANT'S COUNSEL]: So we'll concede to driving.
>
> THE COURT: Okay.
>
> [DEFENDANT'S COUNSEL]: We will concede that the two decedents, the victim's (sic), did die as a result of the accident.

The trial court then discussed this further with Defendant:

> THE COURT: All right. I just want to be sure, [Defendant], that it is with your permission and you understand that you and your attorney are admitting that you -- you were driving; that two individuals died as a result of the accident - -
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: -- that you were driving while your license was revoked, and it was an impaired revocation, and you are admitting that without the State having to prove that it beyond a reasonable doubt?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: And you're doing that of your own free will? No one is forcing you to do that?
>
> THE DEFENDANT: Yes, ma'am.

The trial court filed "Harbison Admissions" on 8 October 2018. There were three total admissions, which stated:

> 1. That . . . [D]efendant was operating a gold Saturn vehicle on the date of the offense;
>
> 2. That the vehicle he was driving on the date of the offense was involved in a crash with the motorcycle occupied by Tommy Jones and Suzette Jones, resulting in their deaths;

3. That at the time of the offense . . . [D]efendant's drivers license was in a state of revocation as the result of a 1987 impaired driving revocation.

Also on 8 October 2018, "Stipulations" were filed with the trial court, which provided:

1. That at the time of the fatal crash occurring on Sunday, June 17, 2012, on Airport Road also known as SR 1516, . . . . [D]efendant was the driver and operator of the 1996 Saturn four door sedan that was involved in that crash at the time of the crash.

2. That at the time of the crash, . . . [Defendant] knew his license was in the state of revocation for an implied consent offense, driving while impaired.

3. That . . . [D]efendant does stipulate that all of the prior convictions listed in 17CRS1730 and charging . . . [D]efendant with being an habitual felon are in fact his prior convictions.

4. That . . . [D]efendant does stipulate that both of the prior convictions listed in 17CRS1728 and charging . . . [D]efendant with being a violent habitual felon are in fact his prior convictions.

We have previously held that a defendant's trial counsel admitting certain elements of a crime, "while still maintaining the defendant's innocence[,]" does not implicate *Harbison*. *State v. Wilson*, 236 N.C. App. 472, 477, 762 S.E.2d 894, 897 (2014) (citing *State v. Fisher*, 318 N.C. 512, 533, 350 S.E.2d 334, 346 (1986)). However, the situation in this case is different; Defendant consented to admission of certain *elements* of the offenses, but his counsel admitted guilt to the *entire* lesser-included offenses. Further, while it is clear Defendant consented to the admission of

these elements, it is unclear Defendant consented to admitting guilt to the offenses as a whole.

The State contends that Defendant "did not challenge the essential elements of misdemeanor death by motor vehicle" and Defendant's "trial strategy sought to challenge the existence of malice" in order to undermine the second-degree murder charge, and

> [p]rior to trial, [D]efendant stipulated to driving while license revoked as set forth above. Further, during his cross-examination of Trooper Deal, [D]efendant's counsel actively elicited established (sic) that [D]efendant drove off the road to the right, overcorrected, and crossed into the oncoming lane of travel where the collision occurred. Defendant never challenged that he failed to maintain control of his vehicle and that his vehicle crossed into the oncoming lane of travel causing the collision. It is clear that [D]efendant only sought to establish that he did not intentionally do so or do so with malice.

The State essentially contends Defendant effectively conceded every element of misdemeanor death by motor vehicle and therefore effectively conceded guilt to the entire offense.

Even assuming Defendant knowingly consented to each element of the offenses during the trial court's *Harbison* inquiry, nothing in our record indicates Defendant knew the consequences of admitting these elements or that admitting these facts and elements would amount to admitting guilt to the entire offense. Not only must Defendant show knowing and voluntary consent to his counsel's admission of guilt, but "the defendant must be aware of the potential consequences of his decision." *State*

*v. Foreman*, 270 N.C. App. 784, 790, 842 S.E.2d 184, 189 (2020) (citation and quotation marks omitted)). Even if Defendant consented to admission of all the elements of an offense, it is not clear Defendant was aware the consequences of that action would be conceding guilt to the entire offense. In fact, Defendant's actions indicate he was not consenting to conceding guilt to the entire offense. As Defendant notes in his brief, at the initial pre-trial hearing, his counsel only stated Defendant was "willing to concede certain *elements*[,]" (emphasis added), Defendant maintained a not guilty plea to the offenses his counsel admitted guilt to during closing arguments, and the jury was instructed "if you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find the defendant not guilty."

The State's argument is unconvincing since even if a defendant knowingly and voluntarily consents to every element of a criminal offense, this does not necessarily indicate the defendant was aware that conceding these elements would amount to conceding guilt to the entire offense. It may seem logical that by consenting to every element of a criminal offense a defendwould thereby consent to admitting the entire offense, but we cannot presume a defendant understands this distinction and the trial court must inquire as to whether that defendant understands he is admitting guilt to the entire offense.

We finally note that even though Defendant's counsel only conceded guilt to misdemeanor death by motor vehicle, a lesser-included offense of second-degree murder, the charge Defendant was convicted of, we must still grant relief in favor of

Defendant. *See State v. Matthews*, 358 N.C. 102, 108-09, 591 S.E.2d 535, 540-41 (2004) (granting the defendant a new trial where his counsel conceded guilt to second-degree murder, a lesser-included offense of first-degree murder, and the defendant was convicted of first-degree murder). However, instead of granting Defendant a new trial, "we believe that the appropriate remedy is to remand this case to the [trial court] for an evidentiary hearing to be held as soon as practicable for the sole purpose of determining whether [D]efendant knowingly consented in advance to his attorney's admission of" guilt to the misdemeanor death by motor vehicle charge. *State v. McAllister*, 375 N.C. 455, 477, 847 S.E.2d 711, 725 (2020) (citations omitted). "Following the evidentiary hearing, the trial court shall expeditiously make findings of fact and conclusions of law and enter an order. The trial court shall then certify the order, the findings of fact and conclusions of law, and the transcript of the hearing to this Court." *Id.* (citation omitted).

## V. Conclusion

The delay of 6 years between the time Defendant was arrested to the date of his trial is sufficient to require the remand court to analyze the four *Barker* factors. Although we have weighed some factors a bit differently than the trial court, those differences do not change the result. After our *de novo* review, we conclude the trial court properly denied Defendant's motion. We also conclude there was sufficient evidence to support the charge of second-degree murder and the trial court properly denied Defendant's motion to dismiss based on sufficiency of the evidence. Finally,

as Defendant can demonstrate *per se* ineffective assistance of counsel under *Harbison*, we reverse and remand to the trial court "for an evidentiary hearing to be held as soon as practicable for the sole purpose of determining whether [D]efendant knowingly consented in advance to his attorney's admission of" guilt to the misdemeanor death by motor vehicle charge. *See id.*

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

Judges COLLINS and THOMPSON concur.